*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0136p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

Nos. 05-4482; 06-3209
UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

Nos. 05-4482; 06-3086/3209

*v.*

NATHANIEL GRAY,

*Defendant-Appellant.*

No. 06-3086
UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GILBERT JACKSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00580—James S. Gwin, District Judge.

Argued: May 29, 2007

Decided and Filed: April 2, 2008

Before: GILMAN, GIBBONS, and GRIFFIN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** William T. Whitaker, Akron, Ohio, Robert C. Jenkins, New Orleans, Louisiana, for Appellants. Nina Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** William T. Whitaker, Andrea L. Whitaker, Akron, Ohio, Robert C. Jenkins, New Orleans, Louisiana, for Appellants. Nina Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Ann C. Rowland, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellees.

1

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.  In these consolidated appeals, defendants Nathaniel Gray and Gilbert Jackson appeal their jury trial convictions on multiple counts of violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d); conspiracy to obstruct and obstruction of interstate commerce by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951; and "honest services" mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1346.  Gray also pleaded guilty to one count of income tax evasion, 26 U.S.C. § 7201.  Defendants' convictions stem from their alleged schemes to procure government contracts for corporate clients and financial gains for themselves by illicitly providing money and gifts to public officials in exchange for political influence in the bid for municipal contracts.

The paramount common issue raised by both defendants is whether certain evidence obtained through court-authorized electronic surveillance pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III" or "the Act"), 18 U.S.C. §§ 2510-22, was properly admitted at trial and, concomitantly, whether the district court abused its discretion by refusing to require disclosure of certain illegally intercepted conversations of defendants.  Jackson and Gray also challenge the viability of their Hobbs Act convictions in light of our recent decision in *United States v. Brock*, 501 F.3d 762 (6th Cir. 2007).  In addition, defendants raise numerous other issues in these appeals, including, *inter alia*, challenges to the sufficiency of the evidence; the district court's denial of motions for severance, continuance, and mistrial; prosecutorial misconduct; claims of error in jury instructions; and cumulative error.  Gray also appeals his sentences imposed under the advisory Guidelines.

For the reasons stated below, we reverse Gray's convictions on Counts 30, 31, and 41 of the superseding indictment but affirm his convictions and sentences on all remaining counts.  With regard to Jackson, we reverse his conviction on Count 41 but conclude that the remainder of his assignments of error are without merit and affirm his convictions on all other counts.  Accordingly, we affirm in part, reverse in part, and remand these cases to the district court for resentencing consistent with this opinion.

I.

Nathaniel Gray was a businessman based in Cleveland, Ohio, who, during the relevant time period related to this prosecution, operated a consulting firm, ETNA Associates, Inc., and several other businesses.  Gilbert Jackson was a senior vice-president, involved in marketing and business development, in the New Orleans office of Camp, Dresser & McKee ("CDM"), a national design and engineering firm that specializes in wastewater treatment facilities.  In addition to his job with CDM, Jackson independently conducted business as a consultant with Gray.  Gray received monthly payments from CDM and other corporate clients, including Honeywell, and in turn paid Jackson a monthly fee of $2,500 or more.  In the mid-1990's, defendants, along with other individuals, began to engage in a series of discrete transactions that allegedly involved the unlawful payment of cash and gifts to public officials in four cities – Cleveland and East Cleveland, Ohio; Houston, Texas; and New Orleans, Louisiana – for the purpose of steering municipal contracts to defendants' corporate clients.

A lengthy investigation by the government into defendants' activities ensued.  The investigation, which utilized electronic and video surveillance authorized by a federal district court pursuant to Title III, culminated in January 2005 with the issuance by a grand jury of a 45-count superseding indictment charging Gray and Jackson, along with four other individuals, with

violations of RICO, the Hobbs Act, and mail and wire fraud statutes. Gray was also charged with one count of tax evasion.

Codefendants Monique McGilbra, Brent Jividen, and Ricardo Teamor entered into plea agreements with the government, thus leaving Gray, Jackson, and coindictee Joseph Jones, a Cleveland City Councilman, to stand trial. A June 2005 jury trial against these defendants in the District Court for the Northern District of Ohio ended in a mistrial after the jury was unable to reach a verdict on some of the charges. The district court ordered an immediate retrial, which began on August 8, 2005. Jones entered a guilty plea on the third day of trial; thus, the trial proceeded against the present defendants, Gray and Jackson.

On August 17, 2005, the jury found Gray guilty of one count of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity (RICO conspiracy), in violation of 18 U.S.C. § 1962(d) (Count 1); three counts of conspiring to obstruct interstate commerce by extortion (Hobbs Act conspiracy), in violation of 18 U.S.C. § 1951(a) (Counts 2, 26, and 41); twelve counts of obstructing interstate commerce by extortion (substantive Hobbs Act violations), contrary to 18 U.S.C. § 1951(a) (Counts 3-9 and 27-31); and twenty counts of honest services mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1346 (Counts 10-15, 20, 22, 32-40, and 42-44).[1] Gray entered a plea of guilty to tax evasion (Count 45), in violation of 26 U.S.C. § 7201, a charge that had been severed from the primary trial.

The jury convicted Jackson on one count of RICO conspiracy (Count 1); two counts of Hobbs Act conspiracy (Counts 26 and 41); one count of a substantive Hobbs Act violation (Count 28); and four counts of honest services mail and wire fraud (Counts 37 and 42-44). The jury acquitted Jackson on eight counts of mail and wire fraud (Counts 32-36 and 38-40).

Following the jury verdict, defendants moved for a judgment of acquittal and/or new trial under Federal Rule of Criminal Procedure 29. The district court denied defendants' motions. *See United States v. Gray*, Docket No. 1:04CR580, 2005 WL 3059482 (N.D. Ohio, Nov. 15, 2005) (unpublished).

The district court sentenced Gray to 180 months of imprisonment on the RICO and Hobbs Act counts and to 60 months of imprisonment on the tax evasion and fraud counts, with all sentences to be served concurrently. The court ordered Gray to pay $1,587,000 in restitution and $3,700 in special assessments. Jackson was sentenced to concurrent terms of 82 months of imprisonment on Counts 1, 26, 28, and 41 and to concurrent terms of 60 months of imprisonment on Counts 37 and 42-44. The district court ordered Jackson to pay $800 in costs and $100,000 in restitution.

In these consolidated appeals, Gray and Jackson now timely appeal their convictions. Gray also appeals his sentences.

II.

A.

The prosecution's case against defendants consisted of, in significant part, wiretap evidence obtained pursuant to Title III, which sets forth specific procedural requirements that must be followed before the government will be allowed to intercept the private conversations of citizens.

---

[1] During the first trial, jurors acquitted Gray on four counts of honest services mail and wire fraud (Counts 16-19), and the district court granted Gray's motion for judgment of acquittal on a Hobbs Act conspiracy count (Count 23), a substantive Hobbs Act count (Count 24), and a mail fraud count (Count 25). At the second trial, the district court dismissed Count 21 (honest services and mail fraud) as to Gray.

As a prerequisite to surveillance, the government must submit a properly authorized application and obtain an approval order from a judge of competent jurisdiction. 18 U.S.C. § 2516. The Act not only delineates the substantive provisions that must be included in both the surveillance application and authorizing order, but also proscribes the offenses covered under the Act, requires specific findings of fact on the part of the issuing judge with regard to probable cause, and places temporal limitations on the validity of the order. 18 U.S.C. § 2518. "The Supreme Court has explained that this system evinces Congress's 'clear intent to make doubly sure that the statutory authority be used with restraint and only where circumstances warrant the surreptitious interception of wire and oral communications.'" *United States v. Staffeldt*, 451 F.3d 578, 580 (9th Cir. 2006) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)).

Title III provides for the suppression of all or part of the contents of intercepted wire or oral communications "if the disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515. "Any aggrieved person in any trial, hearing, or proceeding in or before any court" may move to suppress intercepted communications on three grounds: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was interpreted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a)(i-iii).

"The words 'unlawfully intercepted' [contained in paragraph (i)] are themselves not limited to constitutional violations," but may include statutory infringements. *Giordano*, 416 U.S. at 527. However, the Supreme Court "did not go so far as to suggest that every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful.'" *United States v. Chavez*, 416 U.S. 562, 574-75 (1974). "To the contrary, suppression is required [under paragraph (i)] only for a 'failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.'" *United States v. Donovan*, 429 U.S. 413, 433-34 (1977) (quoting *Giordano*, 416 U.S. at 527).

While paragraphs (ii) and (iii) of § 2518(10)(a) "must be deemed to provide suppression for failure to observe some of the statutory requirements that would not render interceptions unlawful under paragraph (i)," *Giordano*, 416 U.S. at 527, "every circuit to consider the question has held that § 2518(10)(a)(ii) does not require suppression if the facial insufficiency of the wiretap order is no more than a technical defect." *United States v. Moore*, 41 F.3d 370, 374-75 (8th Cir. 1994) (citing cases from the Second, Third, Fifth, Sixth, and Ninth Circuit Courts of Appeals). Indeed, as represented accurately by the *Moore* court, we have held that suppression is not required for "'every minor facial insufficiency.'" *United States v. Vigi*, 515 F.2d 290, 293 (6th Cir. 1975) (quoting *United States v. Acon*, 513 F.2d 513, 517 (3d Cir. 1975)).

Before trial, Gray, joined by Jackson, filed motions to suppress the Title III intercepts and video surveillance that were used in the investigation on the ground that the government failed to comply with the statutory prerequisites of the surveillance application process. In its subsequent decision denying defendants' motions to suppress, *see United States v. Gray*, 372 F. Supp. 2d 1025 (N.D. Ohio 2005), the district court explained the factual background giving rise to defendants' claims:

> The wiretaps originated with a January 15, 2002, application submitted by David A. Sierleja, an attorney of the DOJ. Sierleja made the application as an investigative or law enforcement officer under Title III. [18 U.S.C. § 2510(7)]. The January 2002 application has several defects. First, Sierleja had received approval for the application from Deputy Assistant Attorney General Malcolm, who is a specially-designated official authorized to review and approve Title III wiretaps. However,

the January 15, 2002, application does not identify the specially-designated Justice Department official who approved the application. The Title III application also does not include a copy of the letter from the specially-designated DOJ official that approved the intercept. In addition, the January 15, 2002, application was not sworn under oath or affirmation, and it does not indicate the time when [Assistant United States Attorney] Sierleja executed it. Sierleja filed the application on January 16, 200[2].

On January 16, 2002, Judge Oliver reviewed the application and issued an order granting an application to commence a thirty-day Title III wiretap of Gray's various phone business and cellular phone numbers. Like the application, the order does not identify the Justice Department official who approved the application.

Following the expiration of the thirty-day period, the Government sought to renew the wiretap. In applying to renew the wiretaps, however, the Government failed to comply with the statutory requirement that [a] specially-designated DOJ official approve the renewal application. A district court judge granted the application. After later appreciating that the Government had not obtained necessary approval from any authorized Justice Department official, the Government self-suppressed the tainted interceptions from the unauthorized renewal applications, spanning from February 15, 2002 to May 13, 2002. Gov't Br., Dkt. 239, at 31.

Seeking to correct the problem associated with the interceptions from February 15, 2002 through May 13, 2002, the Government filed a new Title III wiretap application on July 30, 200[2], regarding the same phone numbers. Correcting the problems in the earlier applications, the July 30, 2002, application identifies the authorizing official and attaches two exhibits: the DOJ letter specially designating the authorizing official and the authorizing official's letter approving the July 30, 2002 intercept. In attempting to show probable cause for this July 30, 2002, application, the Government repeated many of the probable cause allegations that were contained in its January 16, 2002 application. However, the Government also added evidence intercepted in the January 16, 2002 through February 14, 2002 period of wiretaps and evidence derived independently. Judge Matia approved the application on July 30, 2002, and the clerk's office filed the documents under seal.

*Id.* at 1029-30 (footnotes omitted).

In April 2005, after defendants moved to suppress the wiretaps, the district court held a suppression hearing, at which the parties examined the January and July 2002 applications and orders for the intercepts. *Id.* at 1030. After the hearing, the government proffered that, if required, Judge Oliver would testify that he was aware that Sierleja had obtained DOJ approval for the January 15, 2002, application before he signed the order. *Id.* at 1031. The district court denied the government's motion to accept the proffer, but reopened the hearing in May 2005 to allow Sierleja to testify regarding the circumstances surrounding the submission of his application for Title III surveillance. *Id.* Sierleja testified that when he applied for the initial wiretap in January 2002, he told Judge Oliver that he had obtained authorization from a DOJ official specially designated to approve wiretap applications before submitting the application. Sierleja had the authorization letter with him when he appeared before Judge Oliver but did not show the letter to the court. *Id.* According to the district court, "[i]t is not clear from the record whether Sierleja informed Judge Oliver of the name of the authorizing official or whether he merely informed Judge Oliver that he had obtained approval." *Id.*

On June 6, 2005, following the reconvened hearing, the district court issued its opinion and order denying defendants' motions to suppress the Title III wiretap evidence. In a separate order issued on June 8, 2005, the district court denied Gray's motion to suppress interceptions from a closed circuit television camera placed in his office. Defendants now contest the denial of their motions to suppress on the same grounds presented to the district court.

When reviewing a district court's ruling on a motion to suppress a wiretap, we will reverse the court's findings of fact only if they are clearly erroneous. *United States v. Rice*, 478 F.3d 704, 709 (6th Cir. 2007). We review de novo questions of law, including legal conclusions as to the existence of probable cause. *Id.* In reviewing the validity of a Title III surveillance order, "we will accord great deference to the determinations of the issuing judge. However, this deference does not logically apply where the issuing judge is given misleading information in the wiretap application or supporting affidavits." *Id.* (internal citation and quotation marks omitted).

Defendants cite numerous alleged defects on the faces of the January 2002 and July 2002 applications and orders, and in the process used to obtain them, that require suppression of some or all of the derivative evidence secured by the wiretaps. The question before us is whether the district court erred in concluding that these purported imperfections did not constitute grounds for suppression under 18 U.S.C. § 2518(a)(10).

B.

First, defendants allege that the January 2002 and July 2002 wiretap applications violate 18 U.S.C. § 2516, which requires the approval of a wiretap application by the Attorney General or a high-ranking DOJ official "specially designated by the Attorney General," 18 U.S.C. § 2516(1). Although the authorization letters for the January 2002 and July 2002 applications in this case were signed by Deputy Assistant Attorney General John Malcolm, the text of the letters includes the typed name of "Michael Chertoff, Assistant Attorney General, Criminal Division, Department of Justice," indicating that Chertoff drafted the letters. Defendants thus contend that the applications are ambiguous – it is unclear which official, if any, actually authorized the application – and, if it was Malcolm, argue that he was not "specially designated" under § 2516(1) to approve the application.

Defendants also cite the government's admitted noncompliance with a related requirement – that each application and order shall include the identity of the DOJ official authorizing the application – as additional grounds for suppression. 18 U.S.C. § 2518(1)(a) and (4)(d). It is undisputed in this case that the January 2002 application and order violate § 2518(1)(a) and (4)(d) through the omission of the name of the authorizing official on the face of the documents. *Gray*, 372 F. Supp. 2d at 1034. The district court nonetheless concluded that any defects in the January and July 2002 applications and orders did not warrant suppression under the circumstances. We agree.

In *Giordano*, the Supreme Court held that § 2516(1) of Title III "plainly calls for the prior, informed judgment of enforcement officers desiring court approval for intercept authority, and investigative personnel may not themselves ask a judge for authority to wiretap or eavesdrop. The mature judgment of a particular, responsible Department of Justice official is interposed as a critical precondition to any judicial order." *Giordano*, 416 U.S. at 515-16. The Court concluded that the Executive Assistant to the Attorney General was not such a "specially designated" official empowered by § 2516(1) to authorize applications for wiretap orders.[2] Consequently, a Title III wiretap application authorized by the Executive Assistant was "unlawful" under paragraph (i) of § 2518(10)(a), and required suppression of evidence derived from the ensuing court order. *Id.* at

---

[2] 18 U.S.C. § 2516(1) was amended after *Giordano* to expand the DOJ positions that qualified as authorizing officials for purposes of Title III.

523. The Court reasoned that because "the provision for pre-application approval was intended to play a central role in the statutory scheme . . . suppression must follow when it is shown that this statutory requirement has been ignored." *Id*. at 528.

The *Giordano* Court concluded, however, that suppression was not warranted under paragraph (ii) of § 2518(10)(a) because "the order, on its face, clearly, though erroneously, identified [an] Assistant Attorney General . . . as the Justice Department officer authorizing the application, pursuant to special designation by the Attorney General." *Id*. at 526 n.14.

In *Chavez*, a companion case to *Giordano,* the Court held that where the evidence showed that the Attorney General had actually authorized the contested wiretap application, the fact that the application and court order misidentified an Assistant Attorney General as the authorizing official did not render the resultant interceptions "unlawful" under paragraph (i), or the application "insufficient on its face" under paragraph (ii) of § 2518(10)(a), so as to require suppression for failure to comply with § 2516(1):

> Here, the interception order clearly identified "on its face" Assistant Attorney General Wilson as the person who authorized the application to be made. Under § 2516(1), he properly could give such approval had he been specially designated to do so by the Attorney General, as the order recited. That this has subsequently been shown to be incorrect does not detract from the facial insufficiency of the order. Moreover, . . . it appears that the Attorney General authorized the application, as he also had the power to do under § 2516(1). In no realistic sense, therefore, can it be said that the order failed to identify an authorizing official who possessed statutory power to approve the making of the application.

*Chavez*, 416 U.S. at 573-74 (footnote omitted).

The *Chavez* Court also addressed the issue of misidentification of the authorizing official in the context of § 2518(1)(a) and (4)(d):

> The application and order for the Chavez wiretap did not correctly identify the individual authorizing the application, as 18 U.S.C. § 2518(1)(a) and (4)(d) require. Of this there is no doubt. But it does not follow that because of this deficiency in reporting, evidence obtained pursuant to the order may not be used at a trial of respondents. There is no claim of any constitutional infirmity arising from this defect, nor would there be any merit to such a claim, and we must look to the statutory scheme to determine if Congress has provided that suppression is required for this particular procedural error.

*Id.* at 570.

The Court reviewed the legislative history of these provisions and found that the requirements serve primarily to "'fix responsibility' for the source of the preliminary approval." *Id.* at 575. Thus,

> [w]hile adherence to the identification reporting requirements of § 2518(1)(a) and (4)(d) . . . can simplify the assurance that those whom Title III makes responsible for determining when and how wiretapping and electronic surveillance should be conducted have fulfilled their roles in each case, *it does not establish a substantive role to be played in the regulatory system.*
>
> *Nor is there any legislative history concerning these sections*, as there is, for example, concerning § 2516(1), . . . *to suggest that they were meant, by themselves,*

> *to occupy a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance.*

*Chavez*, 416 U.S. at 577-78 (emphasis added).

The *Chavez* Court therefore concluded that because the misidentification of the authorizing official "did not affect the fulfillment of any of the reviewing or approval functions required by Congress," *id*. at 575, suppression was not necessary under the circumstances:

> When it is clearly established, therefore, that authorization of submission of a wiretap or electronic surveillance application has been given by the Attorney General himself, but the application, and, as a result, the interception order incorrectly state that approval has instead been given by a specially designated Assistant Attorney General, the misidentification, by itself, will not render interceptions conducted under the order "unlawful" within the meaning of § 2518(10)(a)(i) or the disclosure of the contents of intercepted communications, or derivative evidence, otherwise "in violation of" Title III within the meaning of § 2515.

*Id*. at 579.

Although the *Chavez* Court hinted in dicta that it was unpersuaded by the contention that "an order incorrectly identifying who authorized the application is equivalent to an order failing to identify anyone at all as the authorizing official" when measured for facial insufficiency under § 2518(10)(a)(ii), *id*. at 573, the Court never reached the present issue of complete omission of an authorizing official's identity from a Title III application or order.

Nonetheless, we agree with the district court that the present case "resembles misidentification cases where courts refused to suppress the intercepted conversations when an authorizing official in fact approved the application because the courts emphasized that the court had notice that the Justice Department authorized the application." *Gray*, 372 F. Supp. 2d at 1037 (citing *United States v. O'Connell*, 841 F.2d 1408, 1416 (8th Cir. 1988) (misidentification in application not grounds for suppression where court approving order knew of it and authorization letter was attached to application)).

In the wake of *Giordano* and *Chavez*, we, along with other courts, have held that suppression is not warranted under §§ 2516(1) or 2518(1)(a) and (4)(d) when a wiretap application or order either misidentifies a DOJ official who could not legally authorize the wiretap or, as in the present case, identifies no official at all, so long as the record shows that a statutorily designated official actually gave the authorization. *See United States v. Callum*, 410 F.3d 571, 576 (9th Cir. 2005) (failure to identify any approving DOJ official in wiretap order deemed "minor insufficiency for which suppression is not the appropriate remedy," where issuing judge was presented with written DOJ authorization for wiretap before signing order); *United States v. Radcliff*, 331 F.3d 1153, 1160-63 (10th Cir. 2003), and *United States v. Fudge*, 325 F.3d 910, 918 (7th Cir. 2003) (where applications were in fact approved by specially designated DOJ officials, failure in wiretap orders to name individuals who authorized application was merely a "technical defect" that did not require suppression); *United States v. Lawson*, 545 F.2d 557, 562-63 (7th Cir. 1975), and *United States v. Swann*, 526 F.2d 147, 149 (9th Cir. 1975) (facial insufficiency of applications indicating approval by official not statutorily designated to approve wiretap applications did not require suppression where Attorney General in fact approved applications); and *Vigi*, 515 F.2d at 292-93 (suppression not required where wiretap application identified acting assistant attorney general as authorizing official, but Attorney General actually approved it).

In the present case, the district court found that: (1) Deputy Assistant Attorney General Malcolm was "specially designated" to authorize the Title III applications, pursuant to a March 8,

2001, order from then Attorney General John Ashcroft designating any Deputy Assistant Attorney General of the criminal division as having authority to approve wiretap applications; (2) Malcolm thus had authority to, and did in fact, authorize the January 2002 and July 2002 applications; (3) given his authority, Malcolm was thus "'presumed to have properly exercised that power and the condition[s] precedent [are] presumed to have been met unless the defendants offer evidence, apart from mere conjecture or speculation, to rebut this presumption'"; and (4) that defendants failed to introduce sufficient evidence to legitimately dispute the authenticity of Malcolm's authorizations. *Gray*, 372 F. Supp. 2d at 1032-34 (quoting *O'Connell*, 841 F.2d at 1416). The district court therefore held that suppression of the January 2002 and July 2002 applications was not required under § 2516(1).

We find no clear error in the factual determinations of the district court. The evidence of record confirms that Malcolm had the authority as a "specially designated" official to approve the applications and did in fact do so. Under these circumstances, the underlying purpose of § 2516(1) – "to insure that decisions to wiretap were made by the named officials and did not reach into the lower echelons of command" – was served. *United States v. Lambert*, 771 F.2d 83, 90-91 (6th Cir. 1985) (emphasis omitted) (quoting *United States v. Cox*, 462 F.2d 1293, 1300 (8th Cir. 1972)). We therefore conclude that suppression of the evidence obtained from the January 2002 and July 2002 applications and court orders was not required under § 2518(10)(a)(i) or (ii) for failure to obtain approval from a "specially designated" official.

Moreover, as the district court explained so succinctly, "[b]ecause the procedures employed in this case sufficiently fixed responsibility with the Justice Department, which satisfies the underlying purpose of the identification requirement [of § 2518(1)(a) and (4)(d)], suppression is not warranted for omitting Malcolm's name from the [January 2002] application [and order]." *Gray,* 372 F. Supp. 2d at 1037. The essential safeguards of Title III were not undermined.[3] Judge Oliver had notice that a qualified "specially designated" official had approved the application before his perusal and approval of the order. The district court was justifiably hard-pressed to find any "resultant prejudice" to defendants. *Id*. at 1038. In light of defendants' opportunity to examine the application and order at the suppression hearing, and the fact that the application actually had been authorized by Malcolm despite the identification omission, there was no prejudice to defendants arising from this breach of a requirement that does not "occupy a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance." *Chavez*, 416 U.S. at 578. The violation, technical rather than substantive in nature, did not require suppression of the January 2002 application under § 2518(10)(a).

C.

Defendants allege failure by the government to make the application "upon oath or affirmation" as required by § 2518(1). Although the final page of the application containing Sierleja's signature was not signed by Judge Oliver, the application stated that Sierleja had been "duly sworn" and the order signed by Judge Oliver approving the application stated that Sierleja made the application "under oath." Under these circumstances, the district court properly found that § 2518(1) had been satisfied. *Gray*, 372 F. Supp. 2d at 1034; *see also United States v. Florea*, 541

---

[3]In contrast, in *Staffeldt*, cited favorably by defendants, a wiretap application was deemed facially insufficient where the application did not identify any authorizing official and instead mistakenly attached official approval for a wiretap application in an entirely unrelated case from a different district. 451 F.3d at 579. The Ninth Circuit Court of Appeals held that suppression was called for because "the absence of an authorization memorandum regarding Staffeldt" was "likely to affect the judge's determination that a wiretap is or is not warranted." *Id.* at 584 (internal citation and quotation marks omitted). *Staffeldt* is readily distinguishable from the case at hand. Here, where Judge Oliver had notice of approval by a specially designated official, the omission of that information from the application and order could not have affected the decision to grant the wiretap.

F.2d 568, 576 (6th Cir. 1976) (failure of FBI agent to sign affidavit in support of Title III application did not warrant suppression under § 2518(1) where judge based order on agent's oral sworn statements made in his presence, as well as the written application).

D.

In their appeals, defendants raise several other grounds for reversal of the district court's orders denying their motions to suppress evidence obtained through electronic surveillance and closed-circuit television recordings. They allege that: (1) there was insufficient probable cause to support issuance of the wiretap orders under 18 U.S.C. § 2518(3); (2) the "necessity requirement" of 18 U.S.C. § 2518(1)(c) was not satisfied with regard to the January 2002 and July 2002 applications;[4] (3) the government failed to minimize the interception of non-relevant conversations as required by 18 U.S.C. § 2518(5); (4) the government failed to terminate its surveillance upon attainment of the authorized objective, or in any event in thirty days, 18 U.S.C. § 2518(5); (5) the government failed to timely notify defendants that surveillance had ceased under 18 U.S.C. § 2518(8)(d); and (6) the district court erroneously denied Gray's motion to suppress closed-circuit television recordings. Based upon our review of the record, however, we conclude that these issues lack merit and do not warrant further review. The district court was thorough in its analysis and correct in its conclusions that none of these stated grounds mandate suppression of the surveillance evidence obtained under Title III or the video recordings. We therefore affirm the district court's orders denying defendants' motions to suppress.

III.

Defendants contend that the district court erred in refusing to require the government to disclose the conversations that were illegally intercepted between February 15, 2002, and May 13, 2002, and subsequently sealed by the government.[5] The court denied defendants' multiple motions to inspect the communications made during and after trial. We review the district court's decision on this discovery matter for an abuse of discretion. *United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 663 (6th Cir. 2003).

Section 2511(1) of Title III makes it unlawful to "intentionally disclose[] . . . to any other person" or to "intentionally use[] . . . the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of [the statutory provisions]," 18 U.S.C. § 2511(1)(c), (d). Section 2515 expressly prohibits the use of such unlawful communications in a court proceeding:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in any trial, hearing, or other proceeding in or before any court . . . if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515.

Gray contends that he was entitled to disclosure of the sealed communications under several judicially recognized exceptions to the disclosure prohibitions of §§ 2511(1) and 2515. We

---

[4] "Title III requires that an application for a wiretap order contain a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Rice*, 478 F.3d at 709-10 (internal citation and quotations marks omitted).

[5] The parties do not dispute that these communications were unlawfully obtained by the government.

conclude, however, that none of these exceptions applies to the sweeping disclosure sought by defendants.

"The protection of privacy – one of the purposes of Title III . . . – requires strict controls on the repetition of the contents of illegally intercepted communications." *Nix v. O'Malley*, 160 F.3d 343, 350-51 (6th Cir. 1998). "'Each time the illicitly obtained recording is replayed to a new and different listener, the scope of the invasion widens and the aggrieved party's injury is aggravated.'" *Id*. at 351 (quoting *Fultz v. Gilliam*, 942 F.2d 396, 402 (6th Cir. 1991)). Consequently, we have been loath to allow the republication of illegally obtained wiretap evidence and have limited disclosure to "very narrow[]" circumstances. *Id*. at 350.

First, Gray maintains that he was entitled to use the suppressed wiretaps for impeachment purposes. However, "[w]hether or not an impeachment exception exists at all is an open question in this Circuit." *United States v. Wuliger*, 981 F.2d 1497, 1506 (6th Cir. 1992). We have noted that the handful of other courts that have recognized such an exception in criminal cases have limited it to use by the government. *Id*. at 1505-06 (citing *United States v. Echavarria-Olarte*, 904 F.2d 1391 (9th Cir. 1990); *United States v. Vest*, 813 F.2d 477 (1st Cir. 1987); *Anthony v. United States*, 667 F.2d 870 (10th Cir. 1981); and *United States v. Caron*, 474 F.2d 506 (5th Cir. 1973));[6] *see also Nix*, 160 F.3d at 350 (citing *Wuliger*, 981 F.2d at 1506). Under the present circumstances, there is no convincing reason to create, let alone expand to defendant, an impeachment exception where the illegally obtained conversations were self-suppressed by the government and not available for use by either party at trial. Moreover, the record reflects that even without access to the suppressed tapes, Gray's attorney conducted extensive cross-examination of the government's witnesses and was able to point out contradictions in the witnesses' testimony to the jury. Accordingly, Gray's attempt to compel disclosure of the illegal intercepts for this purpose must fail.

The "clean hands" exception to the proscriptions of Title III likewise does not require disclosure under the present circumstances. Consistent with the limitation on disclosure of Title III intercepts for impeachment purposes, the "clean hands" exception permits only the government, not a defendant, to use the contents of illegal wiretaps if it played no role in the interception. *Nix*, 160 F.3d at 350-51 (citing *United States v. Murdock*, 63 F.3d at 1391, 1403 (6th Cir. 1995)). The so-called "defense," "adjudication," and "consent to use" exceptions similarly do not justify disclosure here, for the reasons stated by the district court in its May 9, 2005, opinion denying defendants' motion to inspect the suppressed applications, orders, and intercepts.

Gray also argues that disclosure is mandated under the Jencks Act, 18 U.S.C. § 3500(a), (b), which provides in pertinent part:

> (a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United

---

[6] In *Wuliger*, the defendant, an attorney, was convicted of repeated disclosure of nonconsensual recordings in violation of Title III during the course of his representation of a client in state divorce proceedings. We held that "assuming that an exception exists in the criminal law based on Congress' express approval in the legislative history to the continued use of illegally obtained wiretap evidence for impeachment purposes by the government in criminal cases, we see no basis to create such an exception in civil actions between private parties." *Wuliger*, 981 F.2d at 1506.

> States which relates to the subject matter as to which the witness has testified. If the
> entire contents of any such statement relate to the subject matter of the testimony of
> the witness, the court shall order it to be delivered directly to the defendant for his
> examination and use.

18 U.S.C. § 3500(a), (b).

We have not recognized an exception to Title III's disclosure prohibitions for statements made under the Jencks Act. Indeed, as the district court observed, the issue of whether the Jencks Act requirements "trump[]" the Title III prohibitions of 18 U.S.C. §§ 2511 and 2515 is an issue of first impression in this court. We agree with the district court's assessment, however, that because Gray could not have used the illegally intercepted statements to impeach government witnesses, *Nix*, 160 F.3d at 350, disclosure of the unlawful wiretaps would not serve the distinct purpose of the Jencks Act, which

> was designed to prevent defendants from engaging in "blind fishing expeditions"
> through the government's files, *see, e.g., United States v. Pope*, 574 F.2d 320, 324
> (6th Cir. 1978), but at the same time, to assure defendants of their Sixth Amendment
> right to confront their accusers by compelling the government to produce statements
> useful for impeachment of government witnesses. *United States v. Carter*, 613 F.2d
> 256 (10th Cir. 1979). The Act accommodates both of these concerns by protecting
> the government's interests before trial and by protecting the defendant's rights at
> trial, since under the Act the impeachment material is disclosed in time to be used
> by the defense at trial.

*United States v. Presser*, 844 F.2d 1275, 1283 (6th Cir. 1988).

Furthermore, the government did not review the unlawful wiretaps, but self-suppressed them when the illegalities came to light. Thus, defendants are not presented with the paramount concern voiced in *Presser* – that the denial of access to facts known to the prosecution but not to a defendant would hinder the defendant's meaningful cross-examination because witnesses were not made equally available to both parties. We therefore conclude that the Jencks Act does not, under the circumstances, open a door to inspection of these illegally intercepted communications.

Likewise, Federal Rule of Criminal Procedure 16(a)(1)(B)(i) does not require that the government make the sealed wiretaps available to defendants. This rule requires disclosure of "any relevant written or recorded statement by the defendant if: . . . the statement is within the government's possession, custody, or control; and the attorney for the government knows – or through due diligence could know – that the statement exists," FED. R. CRIM. P. 16(a)(1)(B)(i).

Citing *Lanier v. Bryant*, 332 F.3d 999, 1005 (6th Cir. 2003), Gray contends that Title III does not preclude disclosure of the illegal intercepts under Rule 16. In *Lanier*, a federal prisoner brought a civil action against several government prosecutors and law enforcement agents, pursuant to 42 U.S.C. § 1983 and other statutes, alleging that the defendants violated § 2511(1)(c) of Title III by disclosing illegally intercepted telephone conversations in response to his Rule 16 pre-trial discovery request. *Lanier*, 332 F.3d at 1003-04. We affirmed the district court's order granting summary judgment in favor of the defendants, holding that "[s]ince the recordings were of Lanier, and Lanier presumably requested their disclosure during discovery in his criminal prosecution, . . . any disclosure made pursuant to Rule 16 could not constitute an illegal disclosure." *Id.* at 1005.

*Lanier* is not persuasive authority for several reasons. First, unlike the present case, it did not involve a criminal prosecution, but a civil action. Second, there are dispositive factual differences between *Lanier* and the case at hand. In the context of Lanier's prosecution, there was neither a finding by this court nor a concession by the government that the conversations were

illegally intercepted. *See United States v. Lanier*, 33 F.3d 639, 661 (6th Cir. 1994), *vacated on other grounds*, 43 F.3d 1033 (6th Cir. 1995) ("Although the government claimed that it acted lawfully in intercepting the cordless telephone calls, it nevertheless agreed not to use the tape recordings of the cordless telephone conversations at trial."). Significantly, in *United States v. Lanier*, the government had access to and knowledge of the contents of the intercepted phone conversations and used the intercepts during the course of its criminal prosecution of Lanier. Conversely, the government in the present case self-suppressed the admittedly illegal intercepts without reviewing the contents.

Thus, even assuming arguendo that *Lanier v. Bryant* creates an exception to Title III's disclosure prohibition in the context of Rule 16, the government in the instant case provided defendant in discovery with all of the wiretap tapes to which it had access and could not have used the illegally intercepted statements – of which it was unaware – during the investigation or at trial. Under these circumstances, Title III does not require the disclosure requested by Gray.[7]

Finally, defendants argue that without access to the tainted surveillance, there is no way to determine whether any of the information gleaned from it was used to secure the additional untainted wiretaps. Defendants suggest that the government's case may have been tainted by the unlawful interceptions and claim that FBI Agent Peter Smith, a government witness, may have reviewed the suppressed tapes. However, during questioning outside of the presence of the jury, Smith testified that he was assigned to this case to replace agents who might have been exposed to the illegally obtained wiretaps and that he was never privy to the contents of the suppressed tapes. Thus, the district court properly concluded that there was no evidence of a taint that would justify disclosure of the suppressed wiretaps.[8]

None of the remaining arguments raised by defendants in favor of disclosure of the illegally obtained intercepts convince us that the district court abused its discretion in denying access of the materials to defendants.

---

[7] In *Murdock*, we explained that:

> Our independent reading of the legislative history of Title III leads us to the conclusion that while privacy was a major goal of the legislation, it was privacy in a particular context, namely, that an individual who is the *victim* of an unlawful interception is entitled to protection in court proceedings from any attempt by the *perpetrator* to use the interception against the victim or in any way to benefit from the information which was either contained in, or was the fruit of, the unlawful interception.

*Murdock*, 63 F.3d at 1403. Gray is undoubtedly the victim of the government's unlawful interceptions, but because there was no attempt by the government to use the interceptions against Gray, the specific privacy concerns underlying Title III are not implicated in this case and thus do not compel disclosure of the illegally obtained intercepts.

[8] Defendants' citation to *Alderman v. United States*, 394 U.S. 165 (1969), does not sway our conclusion in this regard. In *Alderman*, after the defendants' convictions had been affirmed and their cases were pending before the Supreme Court, it came to light that the government had engaged in electronic surveillance that may have violated their Fourth Amendment rights and tainted their convictions. *Id.* at 167. The Court remanded the case to give the defendants an opportunity to review the transcripts of the illegally intercepted conversations to determine if any of the evidence "might have contributed to the Government's case." *Id.* at 182.

Unlike the present circumstances, *Alderman* involved not only an acknowledged violation of constitutional rights, but also a concession by the government that the illegally acquired evidence was "arguably relevant to the evidence offered against the defendant[s]." *Id.* at 184. The facts in *Alderman* stand in stark contrast to the handling of the Title III violations here, where there was no constitutional violation, the government discovered the Title III illegalities three years before trial, self-suppressed the tainted intercepts, and took steps to ensure that no prosecutors or FBI agents assigned to the case had any knowledge of the substance of the illegally obtained evidence.

IV.

Next, Gray and Jackson challenge their convictions under the Hobbs Act on grounds of insufficient evidence.

We review de novo the district court's denial of a motion for judgment of acquittal. *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007). The pertinent inquiry is whether, after viewing the evidence in the light most favorable to the prosecution and giving it the benefit of all reasonable inferences from the testimony, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

A.

Gray and Jackson question the viability of their Hobbs Act convictions in light of our recent decision in *United States v. Brock*, 501 F.3d 762 (6th Cir. 2007), which was issued after oral argument in our court on these consolidated appeals. Defendants requested, and we permitted, supplemental briefing on the impact of *Brock* on their Hobbs Act convictions.

The Hobbs Act, 18 U.S.C. § 1951, makes it unlawful to "obstruct[], delay[], or affect[] commerce . . . by robbery or extortion or attempt[] or conspire[] to do so . . . ." 18 U.S.C. § 1951(a). Section 1951(b)(2) defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). "Rather than requiring an explicit quid-pro-quo promise, the elements of extortion are 'satisfied by something short of a formalized and thoroughly articulated contractual arrangement (i.e., merely knowing that the payment was made in return for official acts is enough).'" *United States v. Hamilton*, 263 F.3d 645, 653 (6th Cir. 2001) (quoting *United States v. Blandford*, 33 F.3d 685, 696 (6th Cir. 1994)).

Generally, to convict a defendant of aiding and abetting extortion, the government must prove that the defendant (1) aided the inducement of a victim to part with property; (2) that he did so knowingly and willingly with extortionate means; and (3) that interstate commerce was affected. *United States v. Cornier-Ortiz*, 361 F.3d 29, 37 (1st Cir. 2004).

Under the "color of official right" theory that is alleged in the instant case, "a public official . . . obtains a 'payment to which he was not entitled, knowing that the payment was made in return for official acts.'" *United States v. Kelley*, 461 F.3d 817, 826 (6th Cir. 2006) (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)). It is not essential that a public official have final decision-making authority: "[t]he Hobbs Act reaches anyone who actually exercises official powers." *United States v. Collins*, 78 F.3d 1021, 1032 (6th Cir. 1996) (internal citation and quotation marks omitted).

"It is well settled in this Circuit that 'a private citizen who is not in the process of becoming a public official may be convicted of Hobbs Act extortion under the "color of official right" theory only if that private citizen either conspires with, or aids and abets, a public official in the act of extortion.'" *Kelley,* 461 F.3d at 827 (quoting *United States v. Saadey*, 393 F.3d 669, 675 (6th Cir. 2005)); *see also Collins*, 78 F.3d at 1031 (private individuals may be convicted of extortion under color of official right "where the individual aided and abetted a public official's receipt of money to which he was not entitled."). The underlying rationale is that "[o]ne who collects the extorted payments is no less guilty than the official he serves." *Collins*, 78 F.3d at 1031 (internal citation and quotation marks omitted).

In *Brock*, we examined closely the portion of the Hobbs Act that defines "extortion" as "the obtaining of *property from another*, *with his consent*," 18 U.S.C. § 1951(b)(2) (emphasis added). Against the backdrop of charges of conspiracy to commit extortion under color of official right, we concluded that this statutory language is far more than mere surplusage.

The two defendants in *Brock* were bail bond company owners who bribed a court clerk to prevent the collection of bonds when their criminal-defendant clients absconded. They were convicted of conspiring with the clerk to extort property "under color of official right," in violation of the Hobbs Act, 18 U.S.C. § 1951(a). *Brock*, 501 F.3d at 766. The defendants contended on appeal that the Hobbs Act did not permit them to be convicted of conspiring to extort their own property, and we agreed, reversing their convictions. We opined that

> [t]o be covered by the statute, the alleged conspirators . . . must have formed an agreement to obtain "property from *another*," which is to say, formed an agreement to obtain property from someone outside the conspiracy. Yet that did not happen. These three people did not agree, and could not have agreed, to obtain property from "another" when no other person was involved – when the property, so far as the record shows, went from one coconspirator (one of the Brocks) to another [the court clerk]. We see no reason to ignore the "property from another" requirement and ample reason to give it content . . . .

> In addition to requiring the conspirators to agree to obtain property from another, the statute requires the conspirators to obtain that property with the other's *consent*. How do (or why would) people conspire to obtain their own consent?

*Id.* at 767 (citation omitted).

> We further explained, in broader terms, that

> [t]he Hobbs Act is meant to prohibit public officials from obtaining property from others by extortion. Yet sweeping the Brocks within its coverage through a conspiracy theory effectively transforms the Act into a prohibition on paying bribes to public officials. While the definition of extortion "under color of official right" correctly extends to public officials who *accept* a bribe when there is a quid pro quo for the payment, *see Evans* [*v. United States*], 504 U.S. [255], 269 [(1992)]; *United States v. Harding*, 563 F.2d 299, 305 (6th Cir. 1977), neither the Supreme Court nor our court has construed the statute to cover private individuals who *offer* a bribe to public officials. Congress knows how to prohibit the giving or offering of bribes directly [citing, *e.g.*, 18 U.S.C. §§ 201, 210, 212, and 226]. Having opted not to punish the giving of bribes directly, Congress should not be treated as having prohibited them through the sleight of indictment of an extortion conspiracy.

*Id.* at 768.

We thus concluded that when the government chooses to indict what it believes is bribery of state officials under a Hobbs Act conspiracy, "[e]ither the Act picks up all perpetrators, acquiescors and victims, or it picks up none of them. We say it picks up none of them and would leave it to Congress (if it wishes) to do what it has done before: Make it a crime to offer or give a bribe to a public official." *Id.* at 771.

Nonetheless, we reaffirmed the principle established in *Kelley* and *Collins*, that "[t]he government remains free to charge private individuals with violating the Hobbs Act when they conspire with public officials or aid and abet them in an extortion scheme; it just must satisfy the 'property from another' and 'with his consent' requirements in doing so." *Id.* at 768-69.[9]

---

[9]In *Brock*, we noted: "All agree that the Brocks did not commit a substantive act of extortion. They did not 'obtain[] . . . property from another' person. [18 U.S.C.] § 1951(b)(2). And they are not public officials and thus could not have obtained property 'under color of official right,' *id.*, and did not otherwise use 'actual or threatened force,

Gray and Jackson argue that here, as in *Brock*, the conduct underlying their convictions is not within the scope of the Hobbs Act. According to defendants, the evidence, at best, alleges a scheme to bribe state officials, but does not demonstrate that defendants conspired with, or aided and abetted, public officials in obtaining "property *from another*," a third party. Gray and Jackson assert that no third party was ever coerced or asked to make a payment in return for an official act; instead, taking the evidence in the light most favorable to the government, payments were made directly by defendants to public officials to gain favor and to improve their lot as consultants.

It is therefore incumbent upon us to evaluate the proofs pertaining to the discrete transactions in three different cities that are the bases of the Hobbs Act convictions against defendants.[10] We conclude that Gray's convictions on Counts 30, 31, and 41, and Jackson's conviction on Count 41, must be reversed.

B.

1. East Cleveland, Ohio

Gray was convicted on Counts 2 through 9 of the superseding indictment, which alleged Hobbs Act violations as they related to Gray's transactions with Emmanuel Onunwor, the mayor of East Cleveland from 1998 to 2004 and a former city councilman.[11] Count 2 averred a Hobbs Act conspiracy by Gray, Onunwor, and others, including "public officials in East Cleveland, Gray's clients, and Gray's consulting associates," stemming from an alleged agreement by Gray and the others to provide things of value to public officials, including Onunwor, in return for official acts involving the governance of the City of East Cleveland. The related substantive Hobbs Act counts (Counts 3-9) each alleged that on a specific date, Gray and others, "aiding and abetting each other, attempted to and did obstruct, delay, and affect commerce . . . through extortion, by Emmanuel Onunwor obtaining, under color of official right, cash in an envelope from Nate Gray with his consent."

The evidence indicates that when Onunwor began experiencing financial difficulties in 1994, Gray provided him with cash on several occasions, and, after Onunwor was elected mayor, Gray and Onunwor formed a "business relationship," pursuant to which Onunwor received payments from Gray to influence his decisions as mayor and steer municipal contracts to Gray. At monthly meetings, recorded by a surveillance camera in Gray's office, Gray handed Onunwor envelopes containing $700 to $1,000 in cash.

Onunwor testified that payments he received from Gray after his election as East Cleveland's mayor were "bribes" that "influenced [his] decision to make sure that those contracts" went to Gray. Onunwor also testified that he took specific official actions in exchange for the payments. There was overwhelming evidence that Gray's monthly cash payments to Onunwor were funded by entities seeking to obtain or retain contracts with the city.

In one instance, East Cleveland contracted with a local law firm to assist in the collection of overdue income taxes. After Gray discussed the law firm's contract with Onunwor, Onunwor advised the law firm partners that if they wanted to keep the contract, they needed to work with Gray. Thus, in May 1998, the law firm entered into a "consulting agreement" with Gray, pursuant

---

violence, or fear' in the course of this bribery scheme," *Brock*, 501 F.3d at 767.

[10]Gray was acquitted of, and Jackson was not charged with, Hobbs Act violations emanating from interaction with public officials in the fourth city, Cleveland, Ohio.

[11]Jackson was not alleged to have been involved in the East Cleveland conspiracy.

to which the firm made an initial $2,500 payment to Gray and monthly payments of $1,000 thereafter, for a total of $55,500 during the course of the four-year agreement with Gray. The law firm's tax collection contract continued until 2002, when it was phased out in response to a state audit, which found an alternative, less expensive agency to perform these functions. Four days after the state audit report was issued, the law firm terminated its consulting agreement with Gray.

Gray also approached Onunwor about finding municipal work for another client, Ralph Tyler Company ("RTC"), a Cleveland engineering firm. In response, Onunwor dismissed the company that had an existing engineering contract with the city, replaced it with RTC, and awarded engineering contracts to RTC. After the city's professional services agreement with RTC took effect, Gray increased the amount of his monthly payments to Onunwor to $700. When Onunwor asked Gray for $8,000 to $9,000 to finance a trip to Africa, Gray responded that he would "talk to Ralph [Tyler] about it" and eventually gave Onunwor the money.

Another engineering firm, CH2M Hill ("CH2M") contracted with East Cleveland to run the city's water department after Gray set up the initial meeting between CH2M representatives and Onunwor. Onunwor insisted that the city council approve the contract with CH2M without seeking bids from other companies. From January 2002 through early 2003, CH2M paid RTC, which had no involvement in the water contract, a monthly fee for "consulting services." RTC passed the payments directly to Gray's company, ETNA Associates. CH2M initially paid RTC $2,000 each month, and RTC added $1,000 from its own account, paying Gray $3,000. The monthly payments from CH2M eventually increased to $10,000, all of which went to Gray. After the city contracted with CH2M, Gray increased his payments to Onunwor to $1,000 each month. A state audit later determined that the city's contract with CH2M cost more than twice as much as it would for the city to operate its water services internally.

This abundant evidence of Gray's illicit transactions with Onunwor and third parties clearly shows that Gray conspired with, and aided and abetted, Onunwor's extortion of "property from another, with [their] consent," by funneling payments from Gray's clients, seeking municipal contracts, to Onunwor while he was acting under color of official right. Thus, the evidence is sufficient to sustain Gray's convictions on Counts 2 through 9 of the superseding indictment.

### 2. Houston, Texas

Gray's Hobbs Act convictions on Counts 26 through 31, and Jackson's convictions on Counts 26 and 28, stem from their interactions with Monique McGilbra, the Director of Building Services for the City of Houston, Texas, and allegations that Gray and Jackson provided money and gifts to McGilbra in exchange for McGilbra's assistance in securing municipal contracts for Gray's corporate clients and business associates. Count 26 alleged a Hobbs Act conspiracy between Gray, Jackson, Honeywell Corporation vice-president Brent Jividen, McGilbra, and others, including "Gray's clients" and "Gray's consulting associates," who allegedly provided "things of value, including money, luxury items and food," to Houston public officials McGilbra and Oliver Spellman, in return for official acts intended to benefit Gray, the Gray businesses, Jividen, and Honeywell.

Counts 27, 28, and 29 alleged that favors were provided to McGilbra and her boyfriend, Garland Hardeman, in exchange for official acts. Count 27 related to a Cleveland Browns football weekend provided to McGilbra and Hardeman by Gray and Jividen, in return for her assistance in securing subcontracts from Reliant Energy for Honeywell. Count 28, the only substantive Hobbs Act count on which Jackson was convicted, alleged that Gray, Jackson, and Jividen provided McGilbra and Hardeman with an all-expenses-paid Super Bowl weekend in New Orleans, Louisiana, in exchange for McGilbra's use of her official position to ensure that Honeywell was

retained as a subcontractor on a Houston energy contract. Count 29 arose out of Gray's purchase of a Louis Vuitton purse for McGilbra.

At trial, the government presented substantial evidence supporting these charges. From 1993 to 2003, Gray was employed as a consultant by Honeywell and received regular payments under a series of contracts with the company. In 2001, Honeywell expressed an interest in being hired as a subcontractor for Reliant Energy, one of the companies competing for a $180 million contract to provide electricity and energy efficiency services to the City of Houston, Texas. McGilbra, in her official capacity as director of building services, oversaw the energy contract. Gray invited McGilbra to attend a Cleveland Browns football game in October 2001, telling her that he would take care of all expenses, including accommodations. McGilbra and Hardeman stayed at the Ritz Carlton Hotel, charged a massage and flowers to the room account, and enjoyed a dinner paid for by Gray. The next day, McGilbra and Hardeman attended the football game with Gray and Jividen. During the game, Jividen discussed Honeywell's interest in securing energy contracts through the City of Houston.

Gray thereafter hired Hardeman as a "consultant" to assist Honeywell in obtaining a share of the Houston energy contract. The consulting contract provided that Hardeman would receive half of one percent of the gross revenue that Honeywell received under the energy contract. McGilbra subsequently demanded half of whatever compensation Hardeman received, purportedly because she had directed Hardeman to Gray in the first place. McGilbra thereafter told Reliant's vice-president that she wanted Reliant's proposal to the city to include Honeywell as a subcontractor. Reliant complied and added Honeywell as a subcontractor for demand-side services. McGilbra recommended to the mayor that Reliant be selected as Houston's energy services provider, and Reliant was in fact awarded the contract in December 2001.

The evidence established that Honeywell funded McGilbra's Cleveland weekend. McGilbra testified at the trial that she realized during the football weekend in Cleveland in October 2001 that "this whole thing was sort of a set up" and that Honeywell was involved in paying for the weekend. Her suspicions were correct. The Cleveland weekend expenses were charged to Honeywell executive Jividen's credit card. McGilbra knew that Hardeman would be compensated under this agreement with Gray and would share the money with her only if Honeywell received payments under the Houston energy contract. McGilbra acknowledged that she used her official position with the City of Houston to ensure that Reliant was awarded the contract and that Honeywell was selected as a subcontractor.

Gray continued to provide McGilbra with favors during the initial phase of the Houston energy contract: he purchased tickets and accommodations for McGilbra and Hardeman to attend the Super Bowl in New Orleans in February 2002, treated McGilbra and her family to a $900 dinner in Florida, and purchased a $700 designer purse for McGilbra. McGilbra testified that after buying the purse, Gray questioned her about the status of Honeywell's Houston contract and expressed concern about possible competition for the contract by another company. Gray submitted the invoices for the Super Bowl tickets and accommodations directly to Honeywell for payment. During this time period, Honeywell was making monthly payments of $5,000 to Gray for his services as a "consultant." The jury heard a taped discussion between Gray and Jividen, during which they talked about McGilbra's expenses for the Super Bowl trip and McGilbra's resultant indebtedness to them as Honeywell representatives.

McGilbra testified that at the time of the Super Bowl, she was supervising the demand-side energy contract in Houston for Reliant Energy and that Honeywell would not make money on the contract until it reached a second phase. Thus, the jury could reasonably infer that Gray, Jividen, and Jackson provided an incentive to McGilbra, in the form of Super Bowl entertainment, to ensure her cooperation in expediting the contract. This evidence additionally indicated that Honeywell was

the source of the funds used by Gray to finance the Super Bowl weekend and to purchase the designer purse for McGilbra.

Although Jackson attempts to minimize his involvement with Gray, McGilbra, and Hardeman during the Super Bowl weekend and suggests that he was merely being hospitable to out-of-town guests, rather than aiding Gray and Jividen in the manipulation of municipal contracts, the government provided substantial evidence that Jackson assisted in the scheme by delivering the Super Bowl tickets to McGilbra's hotel. A taped conversation between Gray and Jackson was played for the jury during the trial. In the conversation, Jackson agreed to host McGilbra during the Super Bowl weekend and told Gray to tell Hardeman that "I'll have his . . . tickets." Jackson also stated that he planned to "try to switch their tickets . . . with somebody," and Gray assured Jackson that "if there's a cost associated with that just let me know and I'll take care of it." Jackson entertained McGilbra and Hardeman by taking them out to dine on more than one occasion, including brunch with the mayor of New Orleans.

Gray paid Jackson a monthly fee to assist Gray in obtaining public contracts for corporate clients, including Honeywell. Gray told Honeywell executive Jividen that he had "Gilbert at 2500." When Jividen responded "that's too much for what he's doing for us right now," Gray insisted that "he has done a lot." In light of this conversation insinuating Jackson's participation and Jackson's own comments, the jury was "free to disbelieve" the "innocent explanation for the incriminating facts proved by the government." *United States v. Schreane*, 331 F.3d 548, 562 (6th Cir. 2003) (internal quotation omitted).

Contrary to defendants' claims, and unlike *Brock*, where the illegal payments came from defendants' own bank accounts or from their company's bank account, 501 F.3d at 769, the evidence showed that the payments and privileges bestowed upon McGilbra did not originate with defendants. Gray's corporate clients, seeking government contracts, funneled the illegal payments through defendants to McGilbra. We therefore conclude that the evidence was sufficient to sustain defendants' convictions on these counts.

Gray was convicted on two other substantive Hobbs Act counts, Counts 30 and 31, that alleged illegal transactions with Oliver Spellman, the Chief of Staff for Houston's mayor. Count 30 alleged that Gray and "others known and unknown to the Grand Jury, aiding and abetting each other, attempted to and did obstruct, delay and affect commerce and the movement of a good or commodity through commerce through extortion, by Oliver Spellman obtaining under color of official right approximately $2000 in cash from Gray with his consent." Count 31 similarly charged Gray and others with aiding and abetting each other and obstructing commerce through extortion "by Oliver Spellman obtaining, under color of official right, a hotel stay in Las Vegas, Nevada from Gray with his consent."

The evidence bearing on these counts indicates that in 2002, Gray was part of a joint venture, First Transit, that was bidding for a contract to operate a shuttle service at the Houston airport. Gray was concerned that Houston Mayor Lee Brown might favor a local contractor who was competing for the contract. Gray paid Spellman $2,000 in cash in July 2002 and paid the hotel bill for Spellman's trip to Las Vegas in September. In exchange, Spellman provided Gray with information about the mayor's position on the competing bids for the shuttle contract. Gray also made regular payments to the mayor's brother, Earl Brown. Gray promised Earl Brown an incentive if he talked to the mayor about the shuttle contract; Earl responded that he would "make that phone call." First Transit was eventually awarded the contract.

However, although others were involved in the joint venture with Gray, there was no evidence that the allegedly extortionate payments to and on behalf of Spellman came from a source other than Gray. The proof therefore cannot support the convictions of Gray on Counts 30 and 31,

a point that the government concedes.  As a result, Gray's convictions on Counts 30 and 31 must be reversed.

### 3.  New Orleans, Louisiana

Gray and Jackson were both convicted on Count 41, which alleges that Gray, Jackson, Jividen, and others, including New Orleans official Vincent Sylvain and Gray's clients, conspired to obstruct commerce by extortion by providing to Sylvain cash payments and things of value, in return for official acts involving the governance of New Orleans.

In early 2002, Honeywell sought a $2.5 million contract to provide energy services to the Housing Authority of New Orleans ("HANO").  Gray informed Jackson of Honeywell's interest in the contract, and Jackson indicated that he could "get the initial meeting [but] from that point on they gotta talk retainer."  Jackson told Gray that "this is money to you and I," to which Gray responded that "we can keep it real clean, real quiet and . . . make some real money."

On February 5, 2002, Gray and Jackson conducted a conference call with Honeywell representatives.  Jackson stated that he could arrange a meeting with New Orleans housing officials, including HANO director Benjamin Bell and Sylvain, the mayor's executive director of housing. In a private conversation shortly after the conference call ended, Gray told Jackson that he was going to send Jackson $2,500 to "get this thing going a little bit."  Jackson informed Gray that "Vince" in the mayor's office was "the one pushing this for me," and stated, "I'm gonna flip it to him."  A $2,500 check was drawn on Gray's ETNA account to Jackson later that day.

Jackson called Gray the next day to report that he had a "great meeting" with Bell, who had agreed to meet with Honeywell's representatives to discuss the contract.  Jackson informed Gray that "Vince" had called and that Vince "wants to be . . . part of [a] long term thing."  Gray, in turn, assured Jackson that "if it didn't go out yesterday then it went out today for sure."  A meeting occurred between Jackson and housing officials, including Vincent Sylvain, but the energy services contract was ultimately not awarded because HANO went bankrupt.

The government concedes, and we agree, that although defendants' intention was to obtain the contract for Honeywell, it has not been proven beyond a reasonable doubt that Honeywell actually funded the $2,500 payment, as opposed to Gray making the payment in order to develop a potential business opportunity.  Because the proofs do not adequately show that Gray conspired with Sylvain to extort "property from another," i.e, an unrelated entity outside of the conspiracy, the reversal of Gray's conviction is required.

For these same reasons, Jackson's conviction on Count 41 is likewise rendered infirm.  In light of the deficiencies in the proofs regarding the source of the $2,500 payment, the evidence is insufficient to show that Jackson conspired with Gray, Sylvain, and others to obtain payment "from another" under color of official right and that Jackson served as a conduit for this illegal payment. Consequently, the *Brock* error is not harmless and compels reversal of Jackson's conviction on Count 41.

### C.

In their supplemental briefing, defendants argue that, in view of *Brock*, the district court erred by using the word "bribery" in the jury instructions.  The government responds to this argument and also suggests that the court may have erred by not reiterating the "from another" language in describing the elements of the offense but asserts that any error was harmless, at least as to most of the counts.

We review a district court's choice of jury instructions for abuse of discretion. *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007). A trial court has broad discretion in drafting jury instructions. Consequently, an abuse of discretion will be found only if the jury charge fails to accurately reflect the law. *Id.* A judgment may be reversed based upon an improper jury instruction "only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (internal citation and quotation marks omitted).

Defendants objected to the district court's use of the word "bribery," but did not object to the court's instruction with regard to the "from another" language. When a defendant fails to object to a final instruction, we review the instruction for plain error. *United States v. Blood*, 435 F.3d 612, 625 (6th Cir. 2006).

After explaining the statutory violation of § 1951(a) charged in the indictment, the district court instructed the jury on the statutory definition of "extortion" and twice used the statutory phrase "from another with his consent." The "from another" language was omitted, however, at a later point in the instructions when the court explained the elements of the offense. Certainly repetition of the phrase would have been preferable, and we assume for purposes of our analysis that the failure to include it at the later point was error. We agree with the government, however, that any error was harmless as to the counts of conviction supported by sufficient evidence. As to each of those counts, the government presented abundant evidence from which the jury could infer facts supporting a violation of § 1951(a) under *Brock*, and we find no reason to conclude that a different instruction would have resulted in acquittal.

Similarly, we find no effect on the verdict from the use of the term "bribery" in the jury instructions. The word was used only fleetingly as a shorthand way of referring to certain of the Hobbs Act charges in the indictment, during the part of the instructions describing the various counts of the indictment. The court did not use the word in its explanation of the law to the jurors, and there was no opportunity for confusion as to what conduct was prohibited by statute. If there was any error in the court's use of the word, it was surely harmless.

D.

In sum, our decision in *Brock* highlights that where, as here, the government charges private individuals with Hobbs Act violations under a color of official right theory, it must satisfy the "property from another" and "with his consent" requirements of § 1951(b)(2). *Brock*, 501 F.3d at 768-69. The government did not meet this burden with respect to the charges against Gray in Counts 30, 31, and 41, and with respect to the charge against Jackson in Count 41. We therefore reverse the convictions on these counts, but affirm the remainder of both Gray's and Jackson's Hobbs Act convictions. Defendants' remaining assignments of error concerning their Hobbs Act convictions are unfounded.

V.

Defendants raise many other issues in these appeals, including challenges to the sufficiency of the evidence regarding their RICO and honest services mail and wire fraud convictions; the district court's denial of motions for severance, continuance, and mistrial; a *Batson* claim;[12] alleged prosecutorial misconduct; claims of error in jury instructions; and cumulative error. The merits of these claims were meticulously analyzed and properly resolved by the district court in its opinion and order denying defendants' motions for acquittal and/or new trial. *See Gray*, 2005 WL 3059482, at *5-20. Having conducted our own review of the record, we conclude that defendants' contentions are without merit and therefore do not warrant further discussion.

---

[12]*Batson v. Kentucky*, 476 U.S. 79 (1986).

VI.

Gray also challenges his sentences imposed by the district court on several grounds. At his sentencing hearing on November 16, 2005, the district court determined, pursuant to U.S.S.G. § 2C1.1, that Gray's base offense level was 10, added two levels because the offenses involved more than one incident of extortion, and added four more levels based on a finding that Gray was the organizer of extensive criminal activity. *See* U.S.S.G. §§ 2C1.1(b)(1), 3B1.1(a). The district court then increased Gray's offense level by twenty levels under U.S.S.G. § 2C1.1(b)(2)(A), which allows an enhancement of from two to thirty levels when "the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest," exceeds $5,000. The district court determined the loss to the four cities resulting from Gray's crimes and the illegal contracts exceeded $7.5 million "by a substantial amount."

Finally, the court imposed a two-level increase for obstruction of justice under U.S.S.G. § 3C1.1, finding that Gray obstructed justice by withholding documents that were responsive to grand jury subpoenas and by presenting perjured testimony at trial. At offense level 38 and a criminal history category I, the resultant advisory Guideline range was 235-293 months' imprisonment. After considering the factors set forth in 18 U.S.C. § 3553(a), the court imposed below-Guidelines sentences of fifteen years of imprisonment on all counts, to be served concurrently.

Five days later, on November 21, 2005, counsel for the government e-mailed the deputy clerk of the court and copied Gray's attorney, to point out that the fifteen-year sentences on the tax evasion and mail/wire fraud charges exceeded the five-year statutory maximum penalty for those offenses. The district court issued an amended judgment that same day, imposing five-year sentences on the tax evasion and mail/wire fraud convictions and reaffirming the fifteen-year sentences on the remaining counts. The court ordered the sentences on all charges to run concurrently, consistent with the original judgment.

Approximately three weeks later, on December 16, 2005, Gray filed an objection to the amended judgment. The district court granted the government's opposing motion to strike defendant's objection to the amended sentences, finding that it had jurisdiction to enter the amended judgment pursuant to Federal Rule of Criminal Procedure 35(a), which permits a court, "[w]ithin 7 days after sentencing," to "correct a sentence that resulted from arithmetical, technical, or other clear error." The district court noted that Gray neither objected to the fifteen-year concurrent sentences nor requested a separate sentence on any of the individual counts at the sentencing hearing. The district court held that because Gray waited more than seven days to raise an objection to the amended judgment, it no longer had jurisdiction to further amend the judgment under Rule 35(a). Gray's motion for reconsideration was denied by the district court.

In a separately filed appeal, Gray now raises four challenges to his sentences. He contends that: (1) the amount of loss caused by his conduct was improperly calculated and excessive; (2) the loss calculations and resultant enhancement of his sentences were based on impermissible judicial fact finding, in violation of *United States v. Booker*, 543 U.S. 220 (2005); (3) the obstruction of justice enhancement was clearly erroneous; and (4) his sentences were improperly amended.

We review sentencing decisions under a deferential abuse-of-discretion standard for procedural and substantive reasonableness. *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007) (citing *Gall v. United States*, 128 S. Ct. 586, 594 (2007), and *Rita v. United States*, 127 S. Ct. 2456, 2459 (2007)). "A sentencing court acts unreasonably if it commits legal error in the process of taking the Guidelines or other factors into account, or if it fails to consider them at all." *United States v. Edwards*, 496 F.3d 677, 681 (6th Cir. 2007) (internal citation and quotation marks omitted).

"A sentencing court also acts unreasonably if the sentence rests on a finding of fact that is clearly erroneous." *Id.*

We review a district court's loss calculations under the Guidelines for clear error. *United States v. Mickens*, 453 F.3d 668, 670 (6th Cir. 2006). Under U.S.S.G. § 2C1.1(b)(2)(A), the amount of benefit to be received is an issue of fact subject to clear error review. *United States v. Griffin*, 324 F.3d 330, 365 (5th Cir. 2003). It need not be determined with precision. *Id.* at 366. The value of the benefit received or to be received is "the net value of such benefit." *Id.* (citing U.S.S.G. § 2C1.1(b)(2)(A), comment, (n.2)). Courts must subtract direct costs from the gross value of the contract to determine the net improper benefit. *Id.* "In challenging the court's loss calculation, [a defendant] must carry the heavy burden of persuading this Court that the evaluation of the loss was not only inaccurate, but outside the realm of permissible calculations." *United States v. Hamilton*, 263 F.3d 645, 654 (6th Cir. 2001).

Here, the district court determined that the loss resulting from Gray's crimes included: (1) CDM's $742,000 profit on its Cleveland water contracts that totaled $14,840,000; (2) $3.9 million owed to CH2M as aggregate "management fee" under its water contract with East Cleveland; (3) $275,920, the differential between the amount the law firm charged and the amount the governmental agency would have charged for collecting delinquent taxes under East Cleveland's tax collection contract; (4) $2 million in anticipated profits under Honeywell's proposed $20 million contract to provide energy services to HANO, based on a ten percent profit Honeywell expected to receive on the $20 million contract; (5) $675,000 in profits under Honeywell's $8-10 million energy services contract with Houston; and (6) $647,732 for First Transit's contract to provide shuttle services at the Houston airport.

In arriving at these calculations, the district court opined that "there is strong evidence that . . . the loss was greater," and we agree. If there is an infirmity in the loss calculations, it is not undue inflation of the losses, but underestimation. We find no clear error in the court's method of calculation or its determination of the losses incurred by the four cities as a result of Gray's conduct.

The district court's two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 is likewise not clearly erroneous. The district court imposed the enhancement based upon its finding that Gray obstructed justice by withholding documents that were responsive to grand jury subpoenas and by introducing the perjured testimony of a former partner of the law firm implicated in the East Cleveland scheme to obtain a tax-collection contract. Both of these findings were supported by the record, and either finding provided sufficient justification for application of the obstruction of justice enhancement. *United States v. Carter*, 510 F.3d 593, 597 (6th Cir. 2007); *United States v. Jackson-Randolph*, 282 F.3d 369, 390 (6th Cir. 2002).

Defendant's next contention that the district court impermissibly relied upon judicially found facts regarding the alleged losses in enhancing his sentences is meritless in light of our recurring conclusion that "district judges can find the facts necessary to calculate the appropriate Guidelines range using the same preponderance-of-the-evidence standard that governed prior to *Booker*." *United States v. Ferguson*, 456 F.3d 660, 665 (6th Cir. 2006) (citing *United States v. Stone*, 432 F.3d 651, 654-55 (6th Cir. 2005)). The enhancements here were based on permissible fact finding and were not outside of the bounds of the court's authority.

Finally, although "the authority conferred by [Federal Rule of Criminal Procedure] 35(a) to a district court is extremely limited," *United States v. Arroyo*, 434 F.3d 835, 838 (6th Cir. 2006), we conclude that the district court acted within the scope of Rule 35(a) when it amended Gray's sentences, four days after entry of the original judgment, to correct its error in imposing a sentence

greater than the allowable statutory maximum on the tax evasion and mail/wire fraud counts.[13] *Cf. United States v. Gruenberg*, 53 F.3d 214, 215 (8th Cir. 1995), and *United States v. Jordan*, 895 F.2d 512, 514-16 (9th Cir. 1990) (both permitting correction of sentences under former Rule 35(a) to eliminate illegal excess beyond statutory maximum, so long as correction did not make sentence more onerous). The only effect of the amended judgment in this case was to reduce Gray's sentences on the tax and fraud counts by ten years, without altering his total term of imprisonment. Accordingly, the amendment was not invalid under Rule 35(a). Gray's sentences on all counts except 30, 31, and 41 (which are vacated in light of our reversal of his convictions on these counts) are therefore affirmed.

## VII.

In conclusion, for the reasons stated above, we reverse Gray's convictions as to Counts 30, 31, and 41 of the superseding indictment. We affirm Gray's convictions and sentences pertaining to all remaining counts. We reverse Jackson's conviction on Count 41 only, but affirm in all other respects. Accordingly, we affirm in part, reverse in part, and remand both defendants' cases for resentencing consistent with this opinion.

---

[13] As we noted in *Arroyo*, Rule 35(a) "is not intended to afford the court the opportunity to change its mind about the appropriateness of the sentence . . . [or] used to reopen issues previously resolved at the sentencing hearing through the exercise of the court's discretion with regard to the application of the sentencing guidelines." *Arroyo*, 434 F.3d at 838 (internal citation and quotation marks omitted). Neither of these concerns is present here.