**UNITED STATES of America**

v.

**Ray Roman MARCHAN.**

**Case No. B–11–CR–594–1.**

United States District Court,
S.D. Texas,
Brownsville Division.

Signed Jan. 14, 2013.

Michael J. Wynne, McDermott Will & Emery, Houston, TX, Oscar Ponce, Assistant U.S. Attorney, Brownsville, TX, for Plaintiff United States of America.

Eric J. Davis, Attorney at Law, Houston, TX, for Defendant Ray Roman Marchan.

## AMENDED MEMORANDUM OPINION AND ORDER

ANDREW S. HANEN, District Judge.

Defendant Ray Roman Marchan (hereinafter "Marchan" or "Defendant") has filed a Motion [Doc. No. 118] and subsequently an Amended Motion for Acquittal, Arrest of Judgment, or in the Alternative Motion for New Trial [Doc. No. 119]. The Government has responded to both [Doc. No. 128] and Marchan has replied to that response in effect supplementing his motions for acquittal [Doc. No. 135]. The Court ruled on the legal issues raised by these motions on December 3, 2012 [Doc. No. 151]. This amended opinion is issued to resolve any lingering arguments concerning the issues it addressed earlier.

## I. *BACKGROUND*

Marchan was the subject of a seven (7) count indictment which was returned in June of 2011. The counts can be summarized as follows: (1) Count One is a substantive RICO count; (2) Count Two is a RICO conspiracy count; (3) Count Three is an extortion and aiding and abetting extortion under color of official right count relating to a $4,500 payment made to State District Judge Abel Limas (hereinafter "Judge Limas") by Marchan relating to an *ad litem* appointment; (4) Count Four is an aiding and abetting extortion under color of official right count relating to a $1,700 payment made to Judge Limas by Marchan relating to an *ad litem* appointment; (5) Count Five is an aiding and abetting extortion under color of official right count involving a $5,000 payment for certain discretionary judicial decisions; (6) Count Six is an honest services mail fraud count relating to a payment of certain funds in order to avoid a sanction award; and (7) Count Seven is an honest services mail fraud count relating to a certain

$12,000 *ad litem* payment made by American General Insurance Company, a defendant in Judge Limas's court.

After several continuances to allow the parties to be fully prepared for trial, this case proceeded to a trial by jury in April of 2012. After multiple days of testimony followed by the final instructions by this Court and by arguments of counsel, the jury found Marchan guilty on all seven counts. In order to give context to the various points suggested by Defendant's motion, this Court will at times summarize evidence. The jury heard all of the appropriate evidence and made its decision based upon that evidence. Any summary made herein is not meant to replace or contradict their thoughtful consideration of the evidence. Nor is any factual recitation intended to be construed as official findings of fact, as again those facts were found by the jury and the evidence it considered will be found in the record.

## II. *ARGUMENTS FOR ACQUITTAL*

### A. *The Hobbs Act Claims*

Defendant has raised the issue of whether a person can aid and abet a Hobbs Act extortion while at the same time be the "victim" of the extortion plot. The Hobbs Act criminalizes "obstruct[ing], delay[ing], or affect[ing] commerce ... by robbery or extortion or attempt[ing] or conspir[ing] so to do...." 18 U.S.C. § 1951. "Extortion" is defined in the statute as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.* Counts 3, 4

and 5 of Defendant's Indictment all charge Defendant with aiding and abetting Hobbs Act extortion under color of official right. As a payee of funds in connection with these Counts, Defendant argues that instead of being an aider and abettor of an extortionate scheme, he is the victim of the plot and cannot therefore be held criminally responsible. Our own circuit in *United States v. Wright*, 797 F.2d 245 (5th Cir. 1986), actually raised this issue, discussed it and then decided, due to facts of the case, it need not unconditionally answer it. Consequently, while some of the language in *Wright* is instructive, there has been no definitive holding in the Fifth Circuit (and clearly no ultimate answer from the Supreme Court).

As a preliminary matter, this Court reviews several governing legal propositions. First, a private person may not be directly responsible for an extortion plot exercised through the color of official right. *United States v. Tomblin*, 46 F.3d 1369, 1383 (5th Cir.1995). However, a private person can be held accountable for extortion under color of official right in certain limited circumstances. *United States v. Collins*, 78 F.3d 1021, 1031 (6th Cir.1996). One of those circumstances is when the private person aids and abets a public official's receipt of money to which that official was not entitled. *United States v. Box*, 50 F.3d 345, 351 (5th Cir. 1995); *United States v. Hairston*, 46 F.3d 361, 366 (4th Cir.1995). Nevertheless, it is also generally recognized that the Hobbs Act is not a routine bribery statute. *See, e.g., United States v. Capo*, 817 F.2d 947 (2d Cir.1987).[1]

---

1. The distinction between the crimes of bribery and extortion has been debated for years. "The distinction between bribery and extortion is elusive.... It may be initially attractive to think that bribery and extortion do not overlap, yet this notion is unsupported by history, logic, or common understanding."

James Lindgren, *The Elusive Distinction Between Bribery and Extortion: From the Common Law to the Hobbs Act*, 35 U.C.L.A. L.Rev. 815, 908 (1988). This Court need not resolve that issue to decide the matters currently before it as the United States Supreme Court has held that the two concepts are not mutu-

The case most-cited in discussing the victim/briber dichotomy seems to be *United States v. Nelson*, 486 F.Supp. 464 (W.D.Mich.1980). In fact, in subsequent cases, many parties have simply argued either for or against the adoption of the so-called "*Nelson* Rule." Earl Nelson was a Michigan state senator who accepted a $5,000 bribe from John MacLellan, a lawyer and business man, in exchange for his introduction of legislation to legalize greyhound dog racing in Michigan. Nelson was charged with extortion under color of official right, pursuant to 18 U.S.C. § 1951, for accepting the bribe (just like Judge Limas in the present fact situation). Mac-Lellan was also indicted for aiding and abetting the Hobbs Act violation for paying the bribe to Nelson (just like the allegations against Marchan in this case). MacLellan filed a motion to dismiss the indictment claiming, like Marchan, that the payor of money is the "victim" of any extortion plot and, as such, cannot be prosecuted under the Hobbs Act.[2] The court held:

> Having considered at length the defendants' arguments, *I have concluded that a payor of money* which has been extorted "under color of official right" in violation of the Hobbs Act, *can*, in cer-

tain cases, *be charged under 18 U.S.C. § 2(a) with aiding and abetting that crime.*

\* \* \*

The defendants are correct in maintaining that extortion victims are in a protected class, and that Congress did not intend to criminalize their behavior. The legislative history of the Hobbs Act, as well as its predecessor, the Anti-Racketeering Act of 1934, clearly shows that Congress did not intend to criminalize payments made under threat or fear. *See, United States v. Harding, supra* [563 F.2d 299 (6th Cir.1977)]. As the House Committee on the Judiciary noted, in House Report No. 238 issue February 27, 1945:

> "In the light of the testimony and admissions contained in the hearings and of the above-quoted provisions of the Constitution, there must be agreement that those persons who have been impeding interstate commerce and levying tribute from free-born American citizens engaged in interstate commerce shall not be permitted to continue such practices without a sincere attempt on the part of Congress to do its duty of protecting in-

ally exclusive. *Evans v. United States*, 504 U.S. 255, 267 n. 18, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992).

2. In order to avoid a semantic argument and for the purposes of this order, the Court may describe hypothetically the "payor of the money" as being the "victim." This is not necessarily the case in all factual situations. Many courts portray the true victim as being the person or entity from which the funds originate, either directly or indirectly. Further, *other courts recognize that the true victims are the citizens who expect and deserve a bribe-free government. See, e.g., United States v. Spitler*, 800 F.2d 1267, 1278 (4th Cir.1986) ("... we reject Spitler's claim that he was a mere extortion victim whose acqui-

escence Congress intended not to criminalize under the aiding and abetting and conspiracy statutes. The true victims are the governments and taxpayers of Maryland and the United States whose tax dollars were unjustly depleted by defendants' fraudulent billing scheme of which Spitler's payoffs to Carpenter constituted an integral part" (internal citations omitted)). Similarly, the Court for ease in drafting uses at times in this opinion the words "bribe," "briber" and "bribee" in a generic sense to describe the payment of unentitled funds, the payor of such funds and the recipient of such funds, again not in the legal sense. This opinion will clearly denote any legal use of those terms if and when they are so used.

terstate commerce." 1946 *U.S.Code Congressional Service* 1360, 1370.

*But the defendant in this case is more than just a payor of extorted money. He is an initiator of an extortion.* As such, he is in no position to contend that he is the innocent "victim" of Nelson's alleged extortion. While it is true that payors of extorted money are in a class Congress sought to protect in enacting the Hobbs Act, *initiators of those "extortions"*, even if, in fact, they ultimately become payors, are not within a protected class. *The indictment alleges that MacLellan is more than a mere victim, he is a briber.* Therein lies the gravamen for the second count of the indictment, and MacLellan is mistaken in concluding that this result is inconsistent with § 1951's language.

* * *

Presuming, therefore, that MacLellan's participation in Nelson's alleged extortion involved more than mere payment of money and presuming further that MacLellan actively solicited and procured Nelson's supposed illegal conduct, then *Gebardi* [*v. United States,* 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206 (1932)] is not controlling. If MacLellan actively induced and solicited Nelson's "extortion," then conduct "more active than mere agreement" is involved which would make *Gebardi* inapplicable. The ultimate question, therefore, is whether Congress, in enacting the Hobbs Act, intended to reach payors of "extorted" money where those payors had actively prompted that "extortion." Did Congress intend the Hobbs Act to reach bribers via 18 U.S.C. § 2(a)?

Having found the defendants' contentions unpersuasive, other factors convince me that in fact Congress did intend this result. Both the case history and the legislative history of the Hobbs Act make it abundantly clear that this statute was intended "to prevent anyone from obstructing, delaying, or affecting commerce, or the moment [sic] of any article or commodity in commerce by robbery or extortion, as defined in the bill." The Supreme Court reiterated this point when it declared, in *Stirone v. United States,* that:

> "(the) Act speaks in broad language, manifesting a purpose to use all the constitutional powers Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference 'in any way or degree' 18 U.S.C. § 1951(a)." 361 U.S. at 215, 80 S.Ct. at 272 (emphasis added).

Moreover, I cannot believe that Congress, in enacting the Hobbs Act, consciously considered and rejected the prospect of holding liable payors of extorted money. While the brief and undetailed legislative history establishes Congress' intent to use the utmost of its constitutional power in order to prevent interference with interstate commerce, it does not in any way indicate that Congress even considered the problem of aider and abettor liability. As the Fifth Circuit, in *United States v. Falletta, supra,* [523 F.2d 1198] noted at p. 1200 [ (5th Cir.1975) ] in a similar case involving the Omnibus Crime Control and Safe Streets Act of 1968: "Under these circumstances, we cannot find, as *Gebardi* did, an 'affirmative legislative policy' to create an exemption from the ordinary rules of accessorial liability."

Although MacLellan contends that this interpretation of the Hobbs Act leads to the grand jury's irrational allegation that he aided and abetted the extortion of money from his own self, I do not share his misgivings. Merely because

Congress did not express itself in the most precise and most unambiguous language imaginable does not make its legislation defective. While use of the term "bribery" in place of or in addition to "extortion ... induced ... under color of official right" would have simplified the present controversy, this does not render the Hobbs Act uncogent or illogical.

*Nelson,* 486 F.Supp. at 486–92 (emphasis added) (footnote omitted).

Obviously, this Court has quoted at-length from *Nelson.* It did so because the *Nelson* opinion contains the most thorough analysis of the then-prevailing law. The portions quoted above have resulted in the so-called *"Nelson* Rule," which the Fifth Circuit has capsulized, at least as far as the argument made in *Wright,* as holding that the payor of a bribe can qualify as a Hobbs Act aider and abettor if he/she "actively induced and solicited" the extortion on the part of the official. 797 F.2d at 252.

The Fifth Circuit's analysis concluded:

Even if we were to adopt this [*Nelson's*] analysis, Wright's argument on this point fails for two reasons. *First, the evidence indicates that Wright did aid and abet Armstrong's extortion by actively inducing and soliciting the payment to Armstrong.* He was the one who initially informed Jack Wright that Armstrong was to receive a payment of one-third of the attorney's fees. After hearing complaints about this arrangement from Jack Wright, it was the defendant Wright who requested and convinced Armstrong to take a lesser amount from the fees. By convincing Armstrong to take the lesser fee, and by soliciting and inducing Jack Wright to pay it, Pat Wright aided and abetted Armstrong's extortion of the law firm. In addition, we find no support for Wright's argument that he is to be viewed as a victim of Armstrong's extortionate conduct. *Wright and Armstrong conspired together to extort money* from Wright's law firm. Although Wright actually made out the $3,000 check to Armstrong, it was Wright's law firm that was the real payor. Thus, even if we were to follow Wright's suggestion that we adopt the *Nelson* rule for this circuit, which we do not do today, that rule would not work to the benefit of Wright. His conviction on Count VI stands.[3]

*Id.* at 252–253 (emphasis added). Thus, even if one were to forego adopting the *Nelson* Rule in this Circuit, a payor of extorted money can still be prosecuted under the dictates of *Wright.*

The majority of other courts have either followed *Nelson* or have otherwise sanctioned a Hobbs Act aiding and abetting claim. In *United States v. Currie,* No. RDB–10–0532, 2011 WL 3439942 (D.Md. Aug. 5, 2011), the court was called upon to make the same analysis that is before this Court. The *Currie* court concluded that a victim who has done more than merely acquiesce to the extortion may be found guilty of aiding and abetting and Hobbs Act conspiracy. *Id.* at *10. It cited as authority not only *Nelson* and *Wright,* but also *United States v. Cornier–Ortiz,* 361 F.3d 29 (1st Cir.2004); *United States v. Kenner,* 354 F.2d 780 (2d Cir.1965) and *United States v. Kott,* 625 F.Supp.2d 854 (D.Alaska 2007). *Id.* at *8–10. This Court has found further support by a multitude of courts from a variety of Circuits. *See, e.g., United States v. Lewis,* No. 1:06 CR

---

**3.** While Marchan makes an argument (which will be discussed in greater length below) that the payments emanated from funds he earned, the original payee of the *ad litem* fees, which were the source of the monies of the kickbacks to Judge Limas in Counts 3 and 4, were the parties, attorneys, or their insurance carriers in the underlying *Mancillas* case.

0291, 2006 WL 3342648, at *1 (N.D.Ohio Nov. 17, 2006) ("private individuals can be reached under the Hobbs Act when they either conspire with or aid and abet a public official in the act of extortion"); *United States v. Spitler*, 800 F.2d 1267, 1276 (4th Cir.1986) ("When an individual protected by [the Hobbs Act] exhibits conduct more active than mere acquiescence, however, he or she may depart the realm of a victim and may unquestionably be subject to conviction for aiding and abetting and conspiracy"). Almost every court reviewing the issue has found that individuals who willingly participating in an extortion scheme can face aiding and abetting charges, regardless of whether they actually paid the money involved.

Having stated this proposition, the Court recognizes that the cases are not completely uniform. The primary exception stems from the opinion of the Sixth Circuit in *United States v. Brock*, 501 F.3d 762 (6th Cir.2007). The Brocks, who were brothers and bail bondsmen, were convicted of conspiracy to commit a Hobbs Act violation. The gravamen of the charges was that they paid bribes to a court official to prevent certain bonds that they had written from being scheduled for forfeiture. The court first clarified that the issue was not whether the Brocks had committed a *substantive* Hobbs Act violation. *Id.* at 767. The Brocks did not obtain property "from another" person, and neither was a public official that could have obtained property "under color of official right." *Id.* The issue before the court, rather, was whether the Brocks' scheme—the bribery payments to the court clerk—was a conspiracy to commit extortion as defined in 18 U.S.C. § 1951. *Id.* The court ultimately concluded that,

since the Brocks and the bribed court official were all co-conspirators, they "must have formed an agreement to obtain 'property from *another*,' which is to say, formed an agreement to obtain property from someone outside of the conspiracy" in order to violate the Hobbs Act. *Id.* Since the "bribe" money was paid from the Brocks' own resources to the public official, the money could not have come from others outside of the conspiracy, and a Hobbs Act conspiracy could therefore not have been formed. *Id.*[4] The *Brock* court conceded that under the correct circumstances a bribe paid to a public official could be a Hobbs Act violation, but not under the facts presented. *See id.* at 768 ("The government remains free to charge private individuals with violating the Hobbs Act when they conspire with public officials or aid and abet them in an extortion scheme; it just must satisfy the 'property from another' and 'with his consent' requirements."). *See also Webb v. United States*, Nos. 1:07–cv–254/1:04–cr–188, 1:04–cr–186, 2008 WL 351118 (E.D.Tenn. Feb. 6, 2008).

■ An important distinction must first be made between *Brock* and the instant case. The Brocks were indicted for and convicted of conspiracy to extort, as defined in 18 U.S.C. § 1951, and consequently that is what the Sixth Circuit addressed. Marchan, on the other hand, was convicted of aiding and abetting extortion pursuant to 18 U.S.C. § 2. While conspiracy to commit a crime and aiding and abetting the commission of that crime are similar concepts, they are not identical. First, aiding and abetting, unlike conspiracy, is not a separate and distinct offense. *United States v. Sorrells*, 145 F.3d 744, 752 (5th

---

**4.** The Court also emphasized that the property not only had to come from someone outside the conspiracy, but, as a matter of general extortion law, it also had to have been paid

with that third party's consent. *Id.* at 767–68. According to the court, "[f]ailure to respect the consent requirement blurs the line between robbery and extortion." *Id.*

Cir.1998). Rather, 18 U.S.C. § 2 allows one who has been indicted as a principal to be convicted on evidence that shows he merely aided and abetted offense. *Id.* To be convicted pursuant to 18 U.S.C. § 2, one need only act with the knowledge and intent to advance the commission of the crime. *Id.* A co-conspirator may similarly be held liable for offenses committed by other co-conspirators, but only if the conspirator was a member of the conspiracy when the offense was committed, and if the offense that was committed was in furtherance, or was a foreseeable consequence of, the conspiracy. *United States v. Thomas,* 348 F.3d 78, 84–85 (5th Cir. 2003). To be held liable for the acts of co-conspirators, therefore, one must first be guilty of conspiracy.

■ A co-conspirator and an aider and abettor are thus not one and the same. The essence of the conspiracy is the proof of a conspiratorial agreement, while aiding and abetting merely requires that there be a "community of unlawful intent" between the aider and abettor and the principal. *United States v. Bright,* 630 F.2d 804, 813 (5th Cir.1980). While a community of unlawful intent is similar to an agreement, it is not the same thing. *Id.* A defendant may wittingly aid a criminal act and be responsible as an aider or abettor, but not be liable as a coconspirator because of the lack of knowledge of and participation in an agreement to do illegal acts. *Id.* (citing *United States v. Suarez,* 608 F.2d 584, 586 (5th Cir.1979)).

In most cases this difference would lack any meaningful distinction, but in this instance the difference may be particularly relevant. The Sixth Circuit's opinion in *Brock* strongly relied on the fact that the Brocks were indicted for conspiracy. The court wrote:

To be covered by the statute, the alleged conspirators—the Brocks and Simcox

(the court clerk)—must have formed an agreement to obtain "property from another," which is to say, formed an agreement to obtain property from someone outside the conspiracy. Yet that did not happen. These three people did not agree, and could not have agreed, to obtain property from "another" when no other person was involved—when the property went from one co-conspirator (one of the Brocks) to another (Simcox).

501 F.3d at 767.

■ Thus, the *Brock* decision was predicated on the proposition that extortion conspirators in their agreement to extort, as defined in 18 U.S.C. § 1951, had to agree to extort the property from another, and that other person could not by definition be a party to the conspiracy agreement. Regardless of whether one agrees with the *Brock* decision, it is clear that this case does not require the kind of agreement discussed above. Aiding and abetting, unlike conspiracy, is not a separate offense. *Sorrells,* 145 F.3d at 752. To be guilty of aiding and abetting, one only need to associate oneself with the offense, participate in the venture, and by the participation seek to bring about its successful completion. In this case, it is virtually without dispute that Limas got money "from another"—whether those other "persons" were the parties or attorneys in the *Mancillas* case or Marchan himself, the funds clearly came to Judge Limas from someone else. Thus, if one knowingly aided and abetted that process, one can be held liable as the principal under 18 U.S.C. § 2. *See Id.* ("[T]he aiding and abetting statute, 18 U.S.C. § 2, does not define a separate crime, but rather provides another means of convicting someone of the underlying offense" (internal quotation marks omitted)).

Dicta in *Brock,* however, hinted that its holding extended beyond the parameters

of conspiracy liability pursuant to the Hobbs Act. "While the definition of extortion 'under color of official right' correctly extends to public officials who *accept* a bribe when there is a quid pro quo for the payment, neither the Supreme Court nor our court has construed the statute to cover private individuals who *offer* a bribe to public officials." *Brock*, 501 F.3d at 768 (internal citations omitted). The court continued:

> Under the government's theory, the Act distinguishes among those who perpetrate an extortion scheme, those who acquiesce in it and those who are victimized by it ... Either the Act picks up all perpetrators, acquiescors and victims, or it picks up none of them. We say it picks up none of them and would leave it to Congress (if it wishes) to do what it has done before: Make it a crime to offer or give a bribe to a public officials.[5]

*Id.* at 771. The Sixth Circuit later clarified its holding in *Brock* in *United States v. Gray*, 521 F.3d 514 (6th Cir.2008). The defendants in *Gray* were convicted of both Hobbs Act conspiracy and aiding and abetting substantive Hobbs Act violations due to a scheme they perpetrated to obtain government contracts by providing money and gifts to public officials. *Id.* at 519. The defendants, relying on *Brock*, argued that their convictions could not be sustained because all the evidence proved was that they were involved in a bribery scheme-not an extortion scheme to obtain "property from another." *Id.* at 535. According to defendants, "no third party was ever coerced or asked to make a payment in return for an official act." *Id.* The court

sustained the jury's guilty verdict on the majority of the Hobbs Act aiding and abetting and conspiracy counts, but reversed the convictions for some of them. Addressing defendants' contentions, the court first explained:

> [In *Brock*, w]e reaffirmed the principle established in [*United States v.*] *Kelley* [461 F.3d 817 (6th Cir.2006)] and *Collins*, that "[t]he government remains free to charge private individuals with violating the Hobbs Act when they conspire with public officials or aid and abet them in an extortion scheme; it just must satisfy the 'property from another' and 'with his consent' requirements in doing so."

*Id.* at 534.[6] The court then sustained the jury's verdict on several counts, noting in one set of counts that the evidence was "abundant" that the defendant "conspired with, and aided and abetted, Onunwor's extortion ... by funneling payments from Gray's clients, seeking municipal contracts, to Onunwor while he was acting under color of official right." *Id.* at 536. Similarly, with respect to another set of counts the court wrote:

> Contrary to defendants' claims, and unlike *Brock*, where the illegal payments came from defendants' own bank accounts or from their company's bank account, 501 F.3d at 769, the evidence showed that the payments and privileges bestowed upon McGilbra did not originate with defendants. Gray's corporate clients, seeking government contracts, funneled the illegal payments through defendants to McGilbra.

---

**5.** The Government in this case has never advocated the position cited in *Brock*. It has argued that the Hobbs Act covers perpetrators and aiders and abettors. Nothing herein should suggest that this Court is holding that mere acquiescors or victims are subject to Hobbs Act penalties.

**6.** The *Kelley* and *Collins* decisions established the principle that a private citizen may be held liable for Hobbs Act extortion "under color of official right" if that private citizen aided and abetted the extortion. *See Gray*, 521 F.3d at 533.

*Id.* at 534–538. The *Gray* court concluded with respect to other counts, however, that the evidence was insufficient that the illicit payments originated from someone other than the defendants, and accordingly reversed the convictions. *Id.* at 539–40. Thus, under one interpretation, the court in *Gray* adopted the broader reading of *Brock* and applied the "property from another" rule to aiding and abetting liability, which was the subject of one set of the counts for which the defendants' convictions were reversed. *Id.* at 539. On the other hand, *Gray* reaffirmed that, even in the Sixth Circuit from which *Brock* originated, the law remains that a private citizen can be charged with a Hobbs Act violation "if that private citizen either conspires with, or aids and abets, a public official in the act of extortion." *United States v. Saadey,* 393 F.3d 669, 675 (6th Cir.2005).

Outside of the Sixth Circuit, *Brock* has not been universally accepted. In *Kott,* the Court focused on some of the very arguments suggested by Marchan:

> The Supreme Court [in *Evans v. United States,* 504 U.S. 255, 268, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992) ] further held that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."

> The Sixth Circuit's holding in *Brock* that the payor of a bribe to a state official cannot "conspire with that official to extort property from himself in violation of the Hobbs Act" cannot be reconciled with the Supreme Court's reading of the Hobbs Act as requiring merely that a public official obtain property from another "with his consent, ... under color of official right" to establish extortion under color of official right. The ruling in *Evans* clearly contemplates that a

state official can conspire with a payor to extort property from the payor when the official knows that the payment is made in return for official acts. For the reasons set out above, Kott is not entitled to a judgment of acquittal based on the Sixth Circuit's holding in *Brock.*

625 F.Supp.2d at 857.

■ Marchan has phrased at least one of his objections in *Brock* terms—that the alleged monies being paid to Judge Limas were paid from Marchan's own funds— funds he earned (at least in Counts 3 and 4) as an *ad litem.* Counsel for Marchan has described these payments either as gifts or loans; but he has also agreed hypothetically with the position that even if they were bribes, in the legalistic sense, that they still cannot be the foundation for a Hobbs Act violation. Part of Marchan's argument is that the Hobbs Act is not a general bribery statute, and like the Brock brothers, if Marchan paid the alleged bribe money from his own resources, then there could not have been "property [extorted] from another," and thus no extortion occurred.

This Court overrules the motions for acquittal as they apply to the Hobbs Act convictions. By definition, extortion means: "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The admitted evidence clearly supports the jury's verdict. First, there was ample evidence that Limas and Marchan had an agreement to split the *ad litem* fees that Marchan would receive due to his appointment by Limas. The evidence was clear (and was practically uncontroverted) that he was actively and willingly involved in this scheme and that he was not a victim. The evidence clearly supported the conclusion that his appointment as an *ad litem* meant

that both he and Limas would share in the *ad litem* fee—money which neither one of them would have otherwise received. Secondly, the evidence, including actual audio tapes, proves convincingly that the payments by Marchan to Limas were willingly made as part of the agreed upon scheme. This leads to three conclusions: (1) that Marchan was not an extortion victim; (2) that regardless of which person/entity one considers as the payee of the *ad litem* funds (Marchan or the parties in the state court case), the payments fit the Hobbs Act definition of voluntariness; and (3) that Marchan was a voluntary and active aider and abettor in funneling funds back to Limas.

That leaves the final, and perhaps most difficult, Hobbs Act issue that must be addressed: the property "obtained from another" issue. Initially, this Court notes that the statute does not require the "property obtained" actually be the "bribe" money paid. In other words, the money need not go from the original source directly to the public official. It can be funneled through other individuals, including co-conspirators or aiders and abettors. *See Wright,* 797 F.2d at 252. "One who collects the extorted payments is no less guilty than the one he serves." *Hairston,* 46 F.3d at 366. Clearly, the goal of the scheme here, as alleged in Counts 3 and 4, was to obtain money from third parties. The jury heard the evidence that the original source of the funds eventually funneled to Limas were the parties or lawyers in

the *Mancillas, et al. v. American General Financial Group, et al.* case.[7] The ultimate source of the money in the *Mancillas* case was always going to be the parties in that case. These were not funds long kept in some account of Marchan's that were coincidentally paid to Limas around the time of the *ad litem* payments. There was a significant amount of evidence that both Marchan and Limas contacted defense counsel with urgency seeking the *ad litem* check that upon receipt was almost immediately divided up by Limas and Marchan. That being the case, this Court finds that even if *Brock* represents the law in the Fifth Circuit, the jury's verdict as to Counts 3 and 4 was appropriate.

Nevertheless, Count 5 requires this Court to address the primary *Brock* issue. As stated above, the Hobbs Act only requires that the monies or property obtained by the public official be from "another." It does not state that it must be "from another *outside the scheme's participants.*" That requirement is one engrafted on the Act by the Sixth Circuit. It is not found anywhere in the statute; nor does it have support in the legislative history.[8] This Court finds, moreover, that even if one were to apply *Brock,* its application should be to limited to the conspiracy context to which it was addressed, and that an expansive application of its rule to other fact scenarios is not supported by law or common sense. In fact, if the Hobbs Act interpretation espoused in

7. The funds in Count 3 were paid by American General, in Count 4 by Garcia & Martinez, and in Count 5 presumably by Marchan himself (See Gov. Ex. 49).

8. The Supreme Court in *Evans* did not address this exact issue. Nevertheless, it did discuss in general terms Congress's intent in passing the Hobbs Act. The Court emphasized that Congress intended to outlaw interference with commerce by extortion "in any way or

degree ...." citing *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). It also noted with regard to the issue raised in *Evans* that there was nothing in the legislative history to indicate a "contrary direction." Likewise, in the issue before this Court there is nothing in the history to suggest that the path followed by the *Brock* Court, which, in effect, narrows the application of the Hobbs Act, is the correct one.

*Brock* were literally enforced, courts would need the payor to physically deliver the money to the public official, because delivering it to any intermediary involved in the conspiracy would then shield the public official.[9] Such a result was never intended by Congress. That being the case, this Court holds that even if one assumes the illicit funds paid to Limas did not originate from third parties such as in the *Mancillas* case, but instead came solely from Marchan, that the rule espoused in the *Brock* case should not be followed. Clearly, Limas, the public official who triggered the application of the Hobbs Act, obtained property from another with Marchan's help. Therefore the jury's verdict should remain intact.

The Court finds the evidence and the law supports the jury's verdict with regard to Counts 3, 4 and 5 and overrules the motions for acquittal addressed to those counts.

### B. *The Mail Fraud Counts*

Marchan also argues that neither the evidence nor the law support the two mail fraud (18 U.S.C. § 1341 et seq.) counts and argues that the jury's verdict finding him guilty on those two counts should be set aside.

#### 1. Count Six

Among other issues raised with respect to Count 6, the Court must consider whether the mailing that forms the basis of Count 6 can adequately bring Defendant's conduct under the purview of the federal mail fraud statute, 18 U.S.C. § 1341. This Court finds that it cannot.

In the indictment, the grand jury charged:

**9.** Even the Sixth Circuit in *Gray* sustained the jury's guilty verdict for Hobbs Act conspiracy where the evidence demonstrated that defendants had funneled illicit payments from the original payors to the public official, despite

for the purpose of executing or attempting to execute the scheme and artifice to defraud and deprive, MARCHAN knowingly caused to be delivered by mail or interstate common carrier, according to the directions thereon, or at the place at which they were directed to be delivered ... a letter regarding defendant's motion for sanctions and a proposed order granting sanctions, sent by mail, from Attorney Randall P. Crane, to Judge LIMAS; . . . .

Indictment, Doc. No. 1, p. 15–16. After hearing the evidence, the jury returned a guilty verdict as to Count 6, finding Marchan:

[g]uilty of the crime of aiding and abetting Abel Limas in devising a scheme to defraud and deprive the citizens of Cameron County, Texas, and the citizens of Texas, of their right to the honest and faithful services of Judge Abel Limas through bribery, and that public or private interstate mail carriers were used in furtherance of the scheme, specifically that Judge Abel Limas denied a proposed order on a motion for sanctions from attorney Randall Crane sent via mail in the *Fink, et. al. v. Sun Valley Dusting* case in return for a monetary payment.

Verdict, Doc. No. 93, p. 26.

Despite the findings of the jury, which were supported by the evidence, this Court is convinced that, for the reasons stated below, Count 6 should not be allowed to stand as a matter of law.

■ To be guilty of mail fraud, a defendant must meet at least three elements.

the fact that the indictment in that case alleged that the original payors were co-conspirators to the extortion scheme as well. *Gray,* 521 F.3d at 535–39.

First, the defendant must devise or intend to devise any scheme or artifice to defraud. *United States v. Green*, 494 F.2d 820, 823 (5th Cir.1974). Second, the defendant must cause the mails to be used for the purpose of executing that scheme. *Id.* Third, the mailings must be sufficiently closely related to the defendant's scheme. *United States v. Maze*, 414 U.S. 395, 405, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974).

The mail fraud statute has been in existence in some form or another for over a century. Over that time period, the Supreme Court has issued a number of opinions defining the boundaries of § 1341 and delineating what is and is not mail fraud. A review of the most pertinent cases is appropriate. One of the earliest opinions to address the kind of mailings which fulfill the requirements of the federal mail fraud statute was *United States v. Young*, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548 (1914). In that case, the defendant devised a plan to defraud various banks and other institutions to lend money by misrepresenting the financial soundness of his company. Several statements were sent through the mail. The Court held, "[t]he gist of the offense is the use of the United States mails in the execution of the scheme, or in attempting to do so." The Court went on to hold "[i]t is not an unlawful scheme unless the use of the mails was a part of the scheme...."

Later in *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), the defendant was accused of siphoning money from his publically held company into a shell corporation which then paid benefits to him and other company officers. In furtherance of this scheme, defendant caused several disbursement checks to be sent from the shell corporation through the mail. The Court declined to approve the application of the federal mail fraud statute, finding that the mere mailing of the checks did not fulfill a required element of the statute, that "the mailing must be for the purpose of executing the fraud." *Id.* at 95, 65 S.Ct. 148. The Court further held "[t]he federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Id.*

Ten years later in *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), the Court considered a case involving a defendant who charmed a wealthy woman into marrying him, tricked her into buying him an expensive car and loaning him money to buy a hotel, and then absconded with no intention to return. The Court found the mail fraud statute properly applied to defendant, who had collected the proceeds of a mailed check as an essential part to his scheme. In defining the elements of mail fraud under the statute, the Court importantly ruled that "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* at 9, 74 S.Ct. 358.

The Court further defined the contours of mail fraud in *Parr et al. v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), when it considered a case in which the defendants had conspired to defraud a public school and taxpayers of money. The Court framed the operative question as "whether the uses of the mails that were charged in the indictment and shown by the evidence properly may be said to have been 'for the purpose of executing such scheme,' in violation of § 1341." *Id.* at 385, 80 S.Ct. 1171. Only if the mailings were "a part of the execution

of the fraud" or were "incident to an essential part of the scheme," the Court found, would they fall within the ban of the federal mail fraud statute. *Id.* at 390, 80 S.Ct. 1171.

Later in *United States v. Maze,* the Court addressed the question of how closely mailings must be related to a defendant's scheme in order to bring conduct within the statute. In that case, the defendant stole a car and credit card belonging to an acquaintance, using the card to make purchases across several states. The indictment charged him with mail fraud under the theory that he knew each merchant accepting the card would cause sales slips to be mailed back to the local bank, who would then mail them to the card's rightful owner. The delay in mailing was alleged to enable the defendant to continue his scheme for a considerable amount of time. The Court held that the mailings in the case were not "for the purpose of executing such scheme or artifice" as required by the federal mail fraud statute. *Id.* at 405, 94 S.Ct. 645. Indeed, the defendant "probably would have preferred to have the invoices misplaced by various motel personnel and never mailed at all." *Id.* at 402, 94 S.Ct. 645.

*Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) again addressed the inquiry of what function the mailings in question served. In that case, a defendant was accused of rolling back odometer readings on used cars to fraudulently inflate their resale value. The Court distinguished the case from *Kann, Parr,* and *Maze* on the grounds that in those cases, the mailings "involved little more than post-fraud accounting." By contrast, in *Schmuck,* the mailing of title-registration forms "was an essential step" to the scheme. *Id.* at 714, 109 S.Ct. 1443.

The Court considered the issue again in *Carter v. United States,* 530 U.S. 255, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000), although it did not pronounce any new standard. The Court summarized the law by stating, "mail fraud requires two elements—(1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)." *Id.* at 261, 120 S.Ct. 2159.

In the Fifth Circuit, the clearest distillation of the law of mail fraud appears in *United States v. Green,* 494 F.2d at 823–26. In that case, the defendants devised a scheme to defraud others through the use of twenty-one different credit cards and four different surnames, incurring massive charges they never intended to pay. The Court borrowed heavily from *Pereira,* stating that "[t]he two basic elements of a mail fraud offense are (1) the scheme to defraud, and (2) causing a mailing for the purpose of executing the scheme." *Id.* at 823. A mailing is sufficient to bring certain conduct under the statute "as long as the mailing is a 'step in a plot.'" *Id.* at 824, quoting *Badders v. United States,* 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706 (1916).

The *Green* Court compared its case to *Kann,* in which "the mails served as a 'means of concealment so that further frauds which are part of the scheme may be perpetrated.'" *Id.* at 825, quoting *Kann,* 323 U.S. at 94–95, 65 S.Ct. 148. Had the defendant in *Green,* the Court reasoned, "sought these cards in person, rather than by mail, presumably it would have been more easily detected that [the defendants] were one and the same applicant." *Id.* at 826. In summary, the Court called the mailings in *Green* "indispensable," because "they were 'incident to an essential part of the scheme.'" *Id.,* quoting *Pereira,* 347 U.S. at 8, 74 S.Ct. 358. Conversely, the *Green* Court summarized the

outcome in *Maze* thus: "The Supreme Court held section 1341 inapplicable to Maze's conduct because the mailings were not 'for the purpose of executing' the scheme involved." *Id.* at 824, quoting *Maze*, 414 U.S. at 400, 94 S.Ct. 645.

■ The letter sent by Randall Crane reminding Judge Limas to rule on Crane's motion to sanction Marchan or his clients, the basis of Count 6, cannot form the legal basis of a mail fraud conviction. The evidence presented at trial supports the existence of the first requirement that there existed a scheme to defraud and that the letter was important in the time-line of events. This was no doubt the reason the jury found the defendant guilty of this count. Nevertheless, as a matter of law, the Crane letter clearly does not support the second requirement that the use of the mail be for the purpose of executing (or attempting to execute) that fraud. The letter was not sent "for the purpose of executing the fraud" as stated by *Kann*. Crane was totally unaware of the scheme, just as Limas and Marchan did not cause or even anticipate Crane's letter. It may have been an important factor—even a "but for" factor in the way events eventually unfolded; but it cannot be the basis of mail fraud. The facts in this case make it more akin to *Pereira*, a case in which the mailing could not have been reasonably expected to have been sent. There is no way it could have been a part of the scheme or the actual execution of the fraudulent scheme, or even incident to an essential part of the scheme, as suggested

in *Parr*. The letter was wholly unexpected by Marchan, did not further his interests, and was, in fact, probably counterproductive from his point of view, much like the mailing in *Maze*. Just as with the facts in the *Maze* case, Marchan, and perhaps even Limas, probably wished the mailing had never taken place. The mailing was simply too tangentially related to the scheme. Therefore, the Court grants the Amended Motion for Acquittal and finds Marchan not guilty as a matter of law as to Count 6. Having so found, it need not address the other objections aimed at Count 6.

## 2. Count Seven

■ The Indictment also charges Marchan with mail fraud in Count 7, alleging as the mail fraud nexus a cashier's check sent by Federal Express in the amount of $12,000.[10] The check was sent from American General's Bank of America account in Hartford Connecticut (See Gov. Ex. 10, Excerpt of Test, of Charles Willette, p. 41, June 5, 2012) to James W. Caldwell of Bracewell & Giuliani, then to Charles Willette of the law firm Willette & Guerra, whose office eventually arranged with Marchan for delivery. Following delivery Marchan and Limas divided it up between themselves.

The primary issue before the Court in Count 7 is the same as the one presented as to Count 6 above: did the Federal Express mailing sufficiently bring Marchan's conduct under the federal mail fraud statute? The Court finds that because the check was essential to the

10. The jury found Marchan:
 [g]uilty of the crime of aiding and abetting Abel Limas in devising a scheme to defraud and deprive the citizens of Cameron County, Texas, and the citizens of Texas of their right to the honest and faithful services of Judge Abel Limas through bribery, and that public or private interstate mail carriers were used in furtherance of the scheme,

specifically that Judge Limas, as judge of the 404th Judicial District Court, appointed the defendant as an *ad litem* in the *Mancillas, et al. v. American General Financial Group, et al.* case and in return Ray Roman Marchan split with Judge Limas the court ordered *ad litem* fees, which were sent via Federal Express in the form of a check. Verdict, Doc. # 93, p. 26.

scheme, and that the Marchan/Limas conspiracy solicited and urged the check's immediate delivery such that it was overnighted by Federal Express, the statute should apply, and that the objections to Count 7 are without merit.

Two Fifth Circuit cases explain why the "mailing" in Count 7 confers the necessary jurisdiction of the federal mail fraud statute on Defendant.[11] In *United States v. Rico Indus., Inc.*, 854 F.2d 710 (5th Cir. 1988), the Fifth Circuit considered whether a series of checks sent through the mail to compensate a participant in a kickback scheme could fall under § 1341. The Court ruled that "the checks contained the proceeds of the fraud and thus contained the 'lifeblood of the scheme,' from the defendant's viewpoint." *Id.* at 713, quoting *United States v. Diggs*, 613 F.2d 988, 999 (D.C.Cir.1979). The Court went on to hold that "[m]ailings that distribute the proceeds of the scheme to defraud among the perpetrators are 'incident to an essential part of the scheme.'" *Id.*, citing *Pereira*, 347 U.S. at 8, 74 S.Ct. 358. From the defendant's point of view, the Court reasoned, "receipt of his money was the most important part of the fraud." *Id.* Such was necessarily the case herein. *See also, United States v. Green* at 823, where the Court recognized a defendant satisfies the statute when he causes "a mailing for the purpose of executing the scheme." Limas and/or Marchan were actively involved in trying to get the check expedited which led to the use of Federal Express.

Later in *United States v. Hatch*, the Fifth Circuit again considered whether mailed checks containing proceeds of a fraud bring conduct within the federal mail fraud statute. The Court's analysis took only two sentences: "[the defendant] re-

ceived a portion of the fruits of his crime by mail. The mail fraud statute applies inescapably to this conduct." 926 F.2d 387, 392 (5th Cir.1991).

The jury had evidence that the check forming the basis of Count 7 was indeed part of a larger relationship of kickbacks that existed between Limas and Defendant Marchan. Since that check represented the proceeds of the fraud, and supplied the funds that were kickbacked to Judge Limas, it was essential from the perspective of the scheme. The expressed check clearly fulfills both mail fraud requirements: 1) a scheme to defraud, and 2) that the mailing was for the purpose of executing the scheme. Furthermore, *Rico Industries* and *Hatch* both held that precisely this kind of mailing is covered by the statute.

▮ Defendant makes one additional argument, which is that he cannot be guilty of aiding and abetting honest services mail fraud as a matter of law since he actually earned the *ad litem* fee. Defendant argues that as long as he earned the fee, the money became his, and he was accordingly free to do whatever he wanted with it, including giving it to, loaning it to, or even, in theory, including it in a bribe to Judge Limas. He can only be found guilty of the fraud as a matter of law, he contends, if the evidence established that he did not earn the fees that were the basis of Count 7.

No legal precedent supports such a conclusion. To the contrary, in *Shushan v. United States*, 117 F.2d 110 (5th Cir.1941), the Fifth Circuit first applied an intangible rights interpretation to honest services mail fraud. In that case, the Court found that a public official could be held liable for

---

**11.** A 1994 amendment to the mail fraud statute expanded its reach to private interstate carriers like Federal Express in addition to

the United States Postal Service. *See United States v. Marek*, 238 F.3d 310, 318 (5th Cir. 2001).

urging city action in exchange for bribes, even though that action actually saved the city money. *Id.* at 119. The fact that bribe payments were involved meant that the city was losing profits (the bribes) to which it was entitled, and the public was being defrauded in the process. *Id.* at 115.

Courts extended *Shushan's* reasoning to cover the denial of a public official's honest services, even when there was no direct harm, and possibly even a gain, resulting from the official's conduct. *See, e.g., United States v. Dixon*, 536 F.2d 1388, 1400 (2d Cir.1976). Eventually, all Circuits embraced the honest services theory of fraud. *See Skilling v. United States*, 561 U.S. 358, 130 S.Ct. 2896, 2927, 177 L.Ed.2d 619 (2010).

The inclusion of this understanding of fraud as an integral part of the federal mail fraud law was halted in 1987 when the Supreme Court decided *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). In that case, a state officer had been convicted of mail fraud for selecting a state insurance agent in return for a share of all that agent's commissions, to be paid as kickbacks. The prosecutor had used an honest services theory against the defendant, arguing that he had deprived the citizens of the state of their right to have state affairs conducted honestly, rather than arguing he had deprived value or money from the citizens through his kickback payments. The Court struck down the conviction on the grounds that the mail fraud statute did not cover the deprivation of honest services, but only deprivation of physical property or money. *Id.* at 361, 107 S.Ct. 2875.

Congress responded to the *McNally* decision by passing 18 U.S.C. § 1346, whose aim was to overrule *McNally* and resurrect the honest services, or intangible rights, doctrine of fraud. Most recently in *Skilling* the Court again addressed honest services fraud, reaffirming that bribery and kickback schemes were the "solid core" of the pre-*McNally* doctrine, as well as what Congress intended to reach in passing § 1346. 130 S.Ct. at 2930. The Court used the language of past cases to make its point, calling bribery and kickback schemes "core misconduct covered by the statute," *United States v. Urciuoli*, 513 F.3d 290, 294 (1st Cir.2008), "paradigm case[s]," *United States v. deVegter*, 198 F.3d 1324, 1327–1328 (11th Cir.1999), and "[t]he most obvious form of honest services fraud," *United States v. Carbo*, 572 F.3d 112, 115 (3d Cir.2009). *Id.* at 2931. In summary, the Court held "there is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks." *Skilling*, 130 S.Ct. at 2931 (emphasis in original).

Applying this background to the present case shows why the legal question of whether Marchan *earned* his *ad litem* fee is irrelevant. The jury, armed with clear evidence of a kickback scheme, was completely within the parameters of the honest services doctrine of fraud when it found Marchan guilty. As a matter of law, a jury could reasonably have found that Marchan aided and abetted a scheme to defraud simply based on the existence of the kickback, regardless of how well he performed his *ad litem* duties.

Accordingly, the jury's finding of Marchan's guilt as to Count 7 is supported both by the evidence and by the requirements of 18 U.S.C. § 1341. Marchan's Amended Motion for Acquittal as it pertains to Count 7 is denied.

### C. Evidentiary Complaints

Throughout both motions and the supplement, Marchan argues that the jury had no evidence, insufficient evidence, or "equipoise" evidence to support its verdict.

These objections are overruled. The jury had more than sufficient evidence for each of its findings. Merely because the defendant is able to put a different slant or interpretation on that evidence does not invalidate the jury's verdict.

Defendant also argues that certain evidence admitted in connection with Counts 6 and 7 was highly prejudicial and shocked the moral conscience and, in doing so, somehow prejudiced the jury. Marchan does not identify this evidence. Consequently, this Court has no way to analyze any specific effect or lack thereof. Nevertheless, this Court *sua sponte* has not identified any evidence that improperly prejudiced the jury.

 Marchan argues that he wanted to testify about Count 7, but did not due to his worry about being cross-examined concerning other counts. First, this contention was never raised at trial. No motion was raised to sever individual counts. To the contrary, the Court was informed both by Marchan and his counsel that he did not want to testify. They even asked this Court for permission (which was granted) to put Marchan's knowing and voluntarily decision not to testify on the record. Further, Marchan, a lawyer himself, and his own counsel knew and understood the risk of cross-examination a defendant faces when testifying. He swore under oath that he understood his right to testify and that it was his decision not to. The fact that one desires to avoid cross—examination on certain charges, but wants to testify as to others does not ruin the validity of a trial—especially since there were no objections made before or during trial.

 Marchan also complains for the first time that the Government withheld certain evidence concerning a case in Judge Limas's court involving another local lawyer, *Dolgencorp of Texas v. Lerma,* 288 S.W.3d 922 (2009). He complains that this evidence is exculpatory and should have been disclosed to the Government, citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Dolgencorp,* the Court found that the defendant, who had a default judgment rendered against it because its attorney failed to appear at trial before Judge Limas, was entitled to a new trial in part because under the rule set forth in *Craddock v. Sunshine Bus Lines, Inc.,* 134 Tex. 388, 133 S.W.2d 124 (1939), his failure to appear "was not intentional or the result of conscious indifference." *Id.* at 927. Moreover, he was "not actually aware that trial would begin on [that date]." *Id.*

Defendant's *Brady* argument fails for several reasons. First, Defendant has made no showing that the Government had this evidence before the trial. Second, the case had been publically reported years prior to this trial in the Southwestern Reporter along with all of the other decisions from the Supreme Court of Texas. Defendant did not need the government's assistance to access it. Third, *Dolgencorp* can be distinguished from the present case because Judge Limas was reversed for not granting a continuance. This is not exculpatory for Marchan. It does not mean, as Marchan claims, that Limas did not have the power to sanction him. Judge Limas, as a duly elected state district judge, did have the power to order reimbursement to Sun Valley Dusting for its costs. *See Smith v. Babcock & Wilcox Const. Co.,* 913 S.W.2d 467, 468 (1995). This allegedly hidden evidence does not change that fact. Nor does the chance that one might appeal (and perhaps ultimately prevail) an adverse ruling, such as the one in *Dolgencorp,* change the fact that Judge Limas had the power to sanction Marchan for needlessly costing his opponent money.

The case to which Marchan refers was factually different as well. In that case,

the ruling that was the basis for the appeal was not grounded in an unethical *ex parte* communication (which in and of itself would be a basis for State Bar sanctions) like the one herein. Nor was any party in this case put to trial without a lawyer. The defendant wanted to go to trial or have his summary judgment motion granted, and could not get either. Unlike the party in the case about which Marchan complains, Marchan effectively received his continuance. Thus, the complained about evidence, while marginally relevant, is far from exculpatory. Further, Defendant's claim that Judge Limas would not sanction any lawyer is belied by the very evidence admitted in this case which shows that he did, in fact, sanction a lawyer (Arnold Gonzalez) in *Fink v. Sun Valley Dusting,* the very case at issue (Gov. Ex. 42, 45 p. 4). Marchan's subjective belief that, even without the cash changing hands, he would not be sanctioned may ultimately have been proven to be accurate, especially given the relationship between Limas and Marchan. That is something no one will ever know. Nevertheless, the jury certainly had evidence to support its conclusion that funds were paid to avoid that possibility.

### D. *Marchan's Collateral Claims*

Marchan also makes various ambiguous claims that the evidence admitted for some counts may have tainted the result in other counts. The Court will try to address each of these, in turn, but many are non-specific and give this Court little on which to substantively comment.

█ The first suggests, as alluded above, that there was a prejudicial effect to Counts 1–5 by including them with Counts 6–7. First of all, the Court notes that this was never raised either before or even during the trial. Secondly, it is not true. The evidence supporting Count 7 is

the same or similar evidence that is probative as to Counts 3 and 4. The evidence regarding Count 6 is the same or similar evidence that is probative of the issues raised by Count 5. Hence, the very premise of Defendant's argument is flawed. This Court finds no improper influential spillover as is alleged.

█ Marchan also alleged that the submission of Counts 3, 4, and 5 and the evidence that supported those counts (again without any specific reference to any particular piece of evidence) also prejudiced the remainder of the jury's verdict, including its decision on the RICO allegations in Counts 1 and 2. This Court finds this allegation to be without merit. In fact, the findings of guilt in Counts 3, 4, and 5 support the jury's verdict in Count 1 as they serve as the predicate acts.

As this Court has detailed above, the objections with regard to the Hobbs Act convictions in Counts 3, 4, and 5 have been overruled. The Court recognizes that the application (or in this case the non-application) of the *Brock* doctrine with respect to Count 5 is a question of law that has not yet been decided by the Fifth Circuit. This does not affect the RICO counts for at least two reasons. In *United States v. Peacock,* 654 F.2d 339 (5th Cir.1981), the three defendants were charged with and found guilty of numerous RICO violations. On appeal, they challenged their convictions partially on the ground that the evidence did not support every racketeering act. If any predicate act was reversed, they argued, it would be impossible to determine that the reversed act was not one of possibly only two acts relied upon by the jury to support their guilty finding. *Id.* at 348. In other words, the defendants argued that reversal on the RICO counts was required as a matter of law where the jury had found a pattern of racketeering

based, in part, on predicate acts that had not all been proved. *Id.*

The Court rejected this argument, holding that under the RICO statute, only two predicate acts were required to substantiate a finding of a pattern. As long as the evidence established the existence of at least two acts, then the RICO conviction need not be overturned. "Conviction under 18 U.S.C. § 1962(c)," the Court found, "requires only that the defendant be convicted of two acts of racketeering and that 'the two or more predicate crimes must be related to the affairs of the enterprise but need not be related to each other.'" *Id.,* quoting *United States v. Elliott,* 571 F.2d 880, 889 n. 23 (5th Cir.1978). The Court went on to uphold the RICO convictions, since at least two predicate acts were not overturned. *Id.*

Later in *United States v. Edwards,* 303 F.3d 606 (5th Cir.2002), the Court considered the issue again. The Court affirmed its holding in *Peacock,* holding that the jury's verdict of guilt on the several predicate acts was based upon specific questions, as opposed to a general verdict. *Cf. United States v. Marcello,* 876 F.2d 1147 (5th Cir.1989). The Court quoted a case from the Second Circuit, which held that "the jury's findings of two predicate acts, lawfully constituting a RICO pattern, and of the other elements of a RICO offense, will permit affirmance of a RICO conviction notwithstanding the invalidation of other predicate acts." *Edwards,* 303 F.3d at 642, quoting *United States v. Biaggi,* 909 F.2d 662, 693 (2d Cir.1990). In *Edwards* the jury had found defendants guilty of several enumerated predicate acts, more than two of which were upheld. As a result, the defendants' RICO convictions were upheld. *Id.* at 647.

Consequently, even if the Fifth Circuit were to adopt the *Brock* rule and apply it to Count 5, the RICO conviction would still stand as it has as two predicate acts, the actions found by the jury in Counts 3 and 4. Further, even if Count 5 fails (due to the *Brock* doctrine) to qualify as a Hobbs Act violation, it still would qualify as a predicate act supporting a pattern because the conduct found by the jury would constitute bribery under Texas state law.

## III. CONCLUSION

The Court hereby grants the Motion for Acquittal with respect to Count 6 because as a matter of law the alleged criminal conduct does not satisfy the requirement of a close nexus with the use of the United States mail. All other objections, including those so vague that the Court could not determine the exact basis of the argument, are overruled.